Robert E. KENNEY, III, Appellant,

v.

ESTATE OF Dorothy M. KENNEY, Appellee.

No. 05–91–00629–CV.

Court of Appeals of Texas, Dallas.

April 13, 1992.

Aaron S. Kaufman and Herbert Garon, Jr., Dallas, for appellant.

Ted Sansom, Rockwall, for appellee.

Before STEWART, MALONEY and KAPLAN, JJ.

## OPINION

STEWART, Justice.

Robert E. Kenney, III (Robert) appeals from the trial court's judgment denying probate of the will executed by his wife, Dorothy M. Kenney (Dorothy), on August 17, 1990 (the August will). After hearing evidence, the trial court found that Dorothy lacked testamentary capacity when she executed the August will and that, therefore, Dorothy never revoked the will that she executed on July 11, 1990 (the July will). In two points of error, Robert complains that: (1) the trial court's finding that Dorothy lacked testamentary capacity when she executed the August will is against the great weight and preponderance of the evidence; and (2) the order admitting the July will to probate should be reversed because no record of the hearing was made by a court reporter and, therefore, he is unable to obtain a statement of facts. We affirm the trial court's judgment.

## FACTUAL BACKGROUND

Robert and Dorothy married in September 1955. Dorothy was diagnosed as having cancer in 1988. On July 11, 1990, she executed a will leaving her entire estate to the Kenneys' children. On August 17, 1990, Dorothy executed another will, leav-

ing everything to Robert if he survived her and naming the Kenneys' children as contingent beneficiaries. Dorothy died on August 24, 1990. The July will was offered for probate on October 4, 1990. On October 16, 1990, the trial court signed an order probating the July will and issuing letters testamentary. On January 7, 1991, Robert filed an application to set aside the July will and for probate of the August will and issuance of letters testamentary. After hearing evidence, the trial court found that Dorothy lacked testamentary capacity to execute the August will and that the July will was Dorothy's last will and testament. Robert then perfected this appeal.

## TESTAMENTARY CAPACITY

In his first point, Robert contends that the trial court's finding that Dorothy lacked testamentary capacity when she executed the August will is against the great weight and preponderance of the evidence. He asserts that, at trial, numerous witnesses testified that Dorothy had the mental capacity to make a valid will on August 17, 1990. Appellee replies that there is ample evidence in the record to support the trial court's findings of fact and conclusions of law.

Findings of fact are reviewable for factual sufficiency of the evidence by the same standards that are applied in reviewing the evidence supporting a jury's answer. *Burnett v. Motyka*, 610 S.W.2d 735, 736 (Tex.1980); *Okon v. Levy*, 612 S.W.2d 938, 941 (Tex.Civ.App.—Dallas 1981, writ ref'd n.r.e.). In reviewing an appellant's great-weight-and-preponderance point of error, this Court must consider and weigh all of the evidence relevant to the fact being challenged to determine whether the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Harco Nat'l Ins. Co. v. Villanueva*, 765 S.W.2d 809, 810 (Tex.App.—Dallas 1988, writ denied); *Ellsworth v. Bishop Jewelry & Loan Co.*, 742 S.W.2d 533, 535 (Tex.App.—Dallas 1987, writ denied). However, this Court is not a fact finder, and we do not pass upon the credibility of the witnesses or substitute our

judgment for that of the trier of fact, even if there is conflicting evidence that would support a different conclusion. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986); *Harco Nat'l Ins. Co.*, 765 S.W.2d at 810.

The burden of proving testamentary capacity is on the proponent of a will. *Croucher v. Croucher*, 660 S.W.2d 55, 57 (Tex.1983). "Testamentary capacity" generally is defined as sufficient mental ability, at the time of the execution of the will, (1) to understand the business in which the testatrix is engaged, the effect of making the will, and the general nature and extent of her property; (2) to know the testatrix's next of kin and the natural objects of her bounty; and (3) to have sufficient memory to assimilate the elements of the business to be transacted, to hold those elements long enough to perceive their obvious relation to each other, and to form a reasonable judgment as to them. *Jones v. LaFargue*, 758 S.W.2d 320, 325 (Tex.App.—Houston [14th Dist.] 1988, writ denied).

The testatrix's mental capacity on the day that the will was executed is controlling. *Campbell v. Groves*, 774 S.W.2d 717, 719 (Tex.App.—El Paso 1989, writ denied). However, evidence of incompetency at other times can be used to establish incompetency on the day the will was executed if it demonstrates that the condition persisted and had some probability of being the same condition that existed at the time of the will's making. *Croucher*, 660 S.W.2d at 57 (citing *Lee v. Lee*, 424 S.W.2d 609 (Tex.1968)). Such evidence of incompetency may include lay opinion testimony of witnesses' observations of the testatrix's conduct, either prior or subsequent to execution of the will. *See Campbell*, 774 S.W.2d at 719.

Robert presented the following evidence of Dorothy's testamentary capacity on August 17, 1990, the day the August will was executed. Richard Heffernan, a bookkeeper who prepared the Kenneys' income taxes, testified that he witnessed Dorothy execute the August will. He was in the room with Dorothy for about thirty minutes. Dorothy looked tired and very

sick when she signed the will, but she was alert and conscious. Heffernan believed that Dorothy still had her memory because she recognized Heffernan and his wife right away and remarked that Heffernan's son was getting big. Heffernan stated that Dorothy was "pretty much near the end. So, you know, it wasn't like we had a real big conversation." The notary told Dorothy that the document was her will and showed her where to sign. No one discussed the terms of the will with Dorothy while Heffernan was there. Dorothy did not appear to be under pressure or duress. Heffernan assumed that she voluntarily signed the August will and that she knew what she was doing. Nothing unusual occurred during the signing or witnessing of the August will.

Ted Cain, who notarized the August will, testified that Dorothy signed the will on August 17, 1990. Cain never had met Dorothy before that day. Although Dorothy looked sick and was lying flat on her back in the bed, she was awake and alert. She did not talk much. Cain asked Dorothy whether she knew that she was signing a will; she said that she did. Cain had no way to know whether Dorothy knew what she was doing or whether she signed the will of her own volition, but he felt sure that she did.

Robert testified that he married Dorothy in September 1955; they were married until she died. Robert stated that Dorothy asked him to have a will drawn. The Kenneys each had wills prepared. Dorothy never discussed the terms of the August will with the attorney who drafted it. However, she read the will on August 16 and made changes to it. Robert was in the room before and after, but not during, the will signing. On August 17, Dorothy was alert, her mental condition was good, and she was able to recognize people at the house. Although the nurse's notes for that day show that Dorothy often went to sleep in midsentence, Robert did not notice anything like that. Robert agreed that Dorothy was in a "weak condition" on August 17, but stated that on August 16 through 18 she was alert and had sufficient memory to understand and to know that she was

making a will, to understand the nature and extent of her property, and to know the natural objects of her bounty. After Dorothy signed the will, Robert left a copy of the document on her nightstand in case she wanted to do anything with it, such as read it. Robert testified that Dorothy was able to read until the last two or three days of her life. She was able to play cards during the week that she signed the August will.

Rita Franckek, director of religious education at Dorothy's church, testified that she visited Dorothy on August 12 to give her holy communion. Dorothy was in bed and was physically weak, but she recognized Franckek and asked about Franckek's son and the church pastor. Dorothy was alert, prayed with Franckek from memory, and received holy communion with no problem. Franckek testified that she cannot give communion to someone who does not understand what is happening, does not realize what they are receiving, cannot swallow, or is comatose.

Jacqueline Kenney, Dorothy's daughter-in-law, testified that on August 16 Dorothy was able to talk and to recognize her. There was no indication that Dorothy did not have mental capacity to know what she was doing or to recognize people.

Appellee presented the following evidence that Dorothy lacked testamentary capacity on August 17, 1990. Dorothy's children testified that they spent a lot of time with Dorothy during the last two weeks of her life. During that time, Dorothy was taking several different types of pain killers, including liquid morphine, several times per day. Robert E. Kenney, IV (Robert IV), the Kenneys' son and executor of the July will, testified that he visited Dorothy for about thirty minutes on the morning of August 17. She could neither talk much nor maintain consciousness during his visit. Her eyes were very glassy, and she "didn't appear to be real up for anything." Robert IV testified that he did not see Dorothy read anything the last two weeks of her life, which was unusual because she enjoyed reading. Three weeks before she died, Dorothy could not remem-

ber to take her pills at the times they were needed; she often thought that it was time to take her medication even though she had just taken it. In Robert IV's opinion, Dorothy did not know what she was doing when she signed the August will. Robert IV further testified that, about two days after Dorothy signed the August will, she kept saying that she wanted to go home; Robert IV had to pick her up, walk her around the room, and then tell her that she was home.

Elizabeth Ann Thortis, the Kenneys' daughter, testified that, during the last two weeks of her life, Dorothy was "semi-comatose," i.e., she would fall asleep while someone was talking to her and was too tired to read a book or to watch television. During the last two weeks, Dorothy slept most of the time and did not talk much; she just lay in bed with a "funny look" on her face and slept a lot. Dorothy said many strange things that were out of the ordinary. During that time, Dorothy was taking a lot of medication, which caused her to be drowsy. Dorothy could not read during the last two or three weeks; she just looked straight ahead and had a glazed look. Thortis saw Dorothy on August 15, but not on August 17. On August 15, Dorothy had glassy eyes and slept a lot. Thortis was concerned because Dorothy stared into space and because she did not know whether Dorothy realized that she was there. When Thortis saw Dorothy on August 18, Dorothy could neither read nor speak.

Marie Michelle Kenney, the Kenneys' daughter, testified that Dorothy took liquid morphine on a regular schedule every day for about the last ten days of her life because she no longer could swallow morphine pills. Morphine made Dorothy drowsy and made her hallucinate; she became unconscious when she took the morphine, and it affected her memory. For example, Dorothy would look for her glasses when they were on her face. Marie testified that, on August 17, Dorothy no longer could read her favorite books and would not have been able to read anything, including a will. Also, Dorothy could not stay awake. Two or three weeks before she died, a priest administered Dorothy's last

rites and told Marie that Dorothy was semi-comatose. The evening of August 16, Dorothy stared when she was awake, did not talk, and could not carry on a conversation. Although Dorothy appeared alert at times on August 17, she dozed in and out of consciousness; she would fall asleep when visitors tried to talk to her.

Katherine Rene Childs, the Kenney's daughter, testified that the last two weeks Dorothy could not read her books or stay awake to watch a half-hour television show. Dorothy was "pretty down hill." Dorothy would fall asleep in midsentence while talking. When she was awake, Dorothy was confused and disoriented. She could not carry on a conversation; she only said yes or no. Dorothy could not speak the morning of August 17, but she pointed at the night stand where the August will was. Childs read a couple of sentences of the will, and Dorothy fell asleep. Childs did not see anyone else discuss the will with Dorothy, and she doubts that anyone did because Dorothy could not stay awake. Although Childs is sure that Dorothy signed the August will, she stated that the signature "doesn't look like her regular signature."

Nell Taylor, Dorothy's sister-in-law, testified that, in her opinion, Dorothy would not have been able to read a will the week before she died or to talk to anyone about a will. Frances Gardner, who worked with Dorothy, testified that on August 13 she visited Dorothy and that Dorothy did not speak and slept most of the time. Dorothy never opened her eyes, although she smiled once.

The trial court heard conflicting evidence concerning Dorothy's mental and physical health during the two weeks before her death. The trial court, as fact finder, determined the weight and credibility of the testimony. We do not reweigh the evidence on appeal. There is evidence that Dorothy hallucinated and was unable to speak, to see clearly, to read, or to remain awake as a result of cancer and medication before, on, and after August 17. Dorothy died of cancer one week after executing the August will. From this evidence, the trial

court could have reasonably inferred that these conditions continued and prevented Dorothy from having testamentary capacity when she signed the will on the afternoon of August 17. We conclude therefore that the trial court's finding that Dorothy lacked testamentary capacity to execute the August will is not against the great weight and preponderance of the evidence. Accordingly, we overrule Robert's first point.

### STATEMENT OF FACTS

■ In his second point, Robert asserts that the order admitting the July will to probate should be reversed because no record of the hearing was made by the court reporter. He complains that he cannot challenge the sufficiency of the evidence in regard to that hearing because no statement of facts is available.

Robert made a formal request to the official court reporter for the County Court of Rockwall County for a complete statement of facts in this cause. The court reporter executed an affidavit stating that she was unable to prepare a statement of facts covering the hearing held on October 16, 1990, when the July will was probated, because neither she nor any other court reporter made a stenographic record of the testimony.

Robert relies on section 52.046 of the Texas Government Code to support his contention that the trial court was required to have a court reporter record the October 16 hearing. Section 52.046 provides in pertinent part as follows:

(a) On request, an official court reporter shall:

\*    \*    \*    \*    \*    \*

(2) take full shorthand notes of oral testimony offered before the court, including objections made to the admissibility of evidence, court rulings and remarks on the objections, and exceptions to the rulings;

\*    \*    \*    \*    \*    \*

(4) preserve the notes for future reference for three years from the date on which they were taken; and

(5) Furnish a transcript of the reported evidence or other proceedings, in whole or in part, as provided by this chapter.

\*    \*    \*    \*    \*    \*

(d) A judge of the county court or county court at law shall appoint a certified shorthand reporter to report the oral testimony given in any *contested probate matter* in that judge's court.

TEX.GOV'T CODE ANN. § 52.046 (Vernon 1988) (emphasis added).

Robert argues that a party is entitled to a new trial if, through no fault of his own, he is unable to obtain a proper record of the evidence introduced and if there is no other way to preserve his right to appellate review, citing *Stubbs v. Stubbs*, 685 S.W.2d 643, 645 (Tex.1985), and *Rogers v. Rogers*, 561 S.W.2d 172, 173 (Tex.1978). Both cases cited by Robert involve divorce actions in which the trial court adjudicated custody of the parties' minor children. *Stubbs*, 685 S.W.2d at 645; *Rogers*, 561 S.W.2d at 172. Section 11.14(d) of the Texas Family Code requires that a record be made in *all* suits affecting the parent-child relationship, unless this requirement is waived by the parties with the court's consent. TEX.FAM. CODE ANN. § 11.14(d) (Vernon 1986). Further, in *Stubbs* and *Rogers*, the person seeking the record of evidence was a party to the suit against whom judgment was rendered by the trial court.

Our case is distinguishable from the cases relied on by Robert. First, this is a will-probate case and, thus, is not governed by section 11.14(d) of the Texas Family Code. Section 52.046 of the Texas Government Code requires the court reporter to record oral testimony upon request of the parties or in contested probate matters. Robert did not contest probate of the July will. The court reporter's affidavit states that the October 16, 1990 hearing was "an uncontested hearing and was proved up by written affidavits sworn to by the Executor." Also, no one requested the court reporter to record and to maintain a record of the October 16 hearing. Second, Robert was not a party to the probate of the July

will, and no judgment was entered against him as a result of that proceeding.[1]

Further, Robert's application to set aside the July will and for probate of the August will and issuance of letters testamentary alleged that Dorothy executed the August will, thereby revoking the July will. Robert raised no other grounds to set aside probate of the July will. Robert's entitlement to the relief he sought depended upon his proving by a preponderance of the evidence that Dorothy had testamentary capacity to execute the August will. The issues concerning the alleged revocation of the July will through execution of the August will were fully developed at the hearing on Robert's application. A court reporter was present at that hearing, and this Court has before it a complete record of the oral testimony and documentary evidence presented. Thus, we determine that any error resulted in no harm to Robert. *See* Tex.R.App.P. 81(b)(1). We overrule Robert's second point.

The trial court's judgment is affirmed.

---

1. We note that Robert has raised no issue concerning improper notice of the proceedings to probate the July will.