**AFFIRM in Part, REVERSE and REMAND in Part; and Opinion Filed July 23, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-17-00024-CV

### JAMES D. ANDERTON, INDIVIDUALLY AND AS THE TRUSTEE OF THE JIMMIE W. ANDERTON AND FRANCES E. ANDERTON REVOCABLE LIVING TRUST AGREEMENT, Appellants
### V.
### JENNIFER GREEN, Appellee

**On Appeal from the 354th District Court**
**Hunt County, Texas**
**Trial Court Cause No. 79011**

## OPINION

Before Chief Justice Wright, Justice Lang-Miers, and Justice Whitehill
Opinion by Justice Lang-Miers

James D. Anderton is the trustee of a trust created by his parents Jimmie W. Anderton and

Frances E. Anderton Buchanan.[1] He sued his niece Jennifer Green alleging that she had converted

$750,000 in annuity benefits she received when Frances, her grandmother, died. Jennifer filed

numerous counterclaims and also pleaded claims against James in his individual capacity. The

claims involved Frances's mental capacity and James's actions during a specific time period. After

a bench trial, the trial court rendered judgment for Jennifer. We conclude there was sufficient

evidence to support the trial court's declarations regarding Frances's loss of mental capacity. But

---

[1] For clarity, we use first names for the Anderton family. We will refer to appellant James D. Anderton individually as "James" and to his late father as "Jimmie." We will refer to appellant James D. Anderton, Trustee of the Jimmie W. Anderton and Frances E. Anderton Revocable Living Trust Agreement as "Trustee."

we also conclude that the trial court erred by awarding attorney's fees to Jennifer without hearing evidence regarding the segregation of fees. Accordingly, we affirm the trial court's judgment in part and reverse and remand in part.

## BACKGROUND[2]

Until the last years of her life, Frances Anderton Buchanan was an adept and experienced businesswoman, running a successful grass farm both with her husband Jimmie and on her own after Jimmie's death in 2003. Frances had a daughter, Wilma Smith, from a previous marriage when she married Jimmie; Jimmie had children from a previous marriage as well. Frances and Jimmie had two sons, James and Darrell.

In 1991, Jimmie and Frances signed a "Revocable Living Trust Agreement" (the "Trust"). James and Darrell were equal beneficiaries and were to serve as trustees after their parents' deaths. When Jimmie died in 2003, the Trust was divided into two parts. The irrevocable "Decedent's Trust" held an insurance policy. The revocable "Survivor's Trust" was funded with approximately one million dollars in assets from the original trust. James is now the sole trustee of the Trust, and in that capacity, the plaintiff in this lawsuit.

Frances and James enjoyed a close relationship. James bought the grass farm from his mother in 2009. Frances visited James during his incarceration from 2010 to 2012,[3] and saw him often after his release. James and his wife Sharon lived in one of the three homes on the grass farm's acreage; Frances lived in another.

Jennifer is Wilma's daughter, but Wilma was unable to care for her. When Jennifer was a child, she came to live with Frances and Jimmie. Frances raised Jennifer, providing her with a

---

[2] Fifteen fact witnesses testified at trial. This summary is derived from their testimony.

[3] The exact details of James's offense and incarceration are not included in the record. He testified that he pled "guilty to transporting one whitetail deer across the state line and receiving stolen property from across the state line, conspiracy to." He admitted in a 2012 application for guardianship that he was "on probation for a felony offense."

place to live, food, clothing, spending money, and an education. Jennifer became a registered nurse. Jennifer's middle name is Dee. "Jennifer Dee," as Frances sometimes called her, enjoyed a close relationship with Frances. Frances's generosity to Jennifer continued in Jennifer's adulthood; Frances gave Jennifer a house and several cars. Jennifer, in turn, helped care for Frances when she suffered from cancer in the years before her death. Jennifer's last name became "Green" when she married her second husband in 2008.

Frances's careful management of her own finances continued after she married Clarence Buchanan in late 2004. She and Clarence kept their finances completely separate. And in addition to planning the inheritance for her sons through the Trust, Frances named Jennifer as the beneficiary of several annuities. Jennifer was also listed as a joint owner on some of Frances's bank accounts beginning in 2003, and was the only beneficiary on other accounts as of 2007. Frances told her long-time banker and friend Joe Winniford that her sons "were taken care of through life insurance policies and that Jennifer was going to be taken care of through investments that she had." Similarly, banker Matt Mason testified that Frances told him on "multiple occasions" between 2007 and 2012 that "there was an insurance policy that the trust owned that James and Darrell were getting that and these accounts were going to Jennifer."

But by 2011, Frances suffered from dementia. Clarence placed a copy of their marriage certificate under the glass on their coffee table to remind Frances that they had married. Frances hid her clothing, convinced that it was being stolen from her closet. She hid the mail, her driver's license, and Clarence's dentures. She spoke of calling and visiting her father, who had died in 1972, and seeing him out in the grass field. She said that squirrels had taken and sold the pecans from the trees in her yard. Adding to Frances's difficulties were Darrell's two ongoing lawsuits against her, and there was evidence that Frances was afraid of Darrell after incidents of his violent behavior in previous years. And in 2012, Frances became convinced that "Jennifer Green," whose

name appeared on some of her bank statements, was stealing money from her. Clarence's assurances that no money was missing from the accounts, and that "Jennifer Green" was the "Jennifer Dee" who Frances knew and loved, were to no avail. Clarence blacked out "Jennifer Green" on the bank statements, which pacified Frances for a time. But Frances's agitation over the accounts continued, culminating in the events of October 15 through 18, 2012, which are the basis of this lawsuit. In spite of her difficulties, however, Frances also had days in 2012 on which she appeared to be fully aware and cognizant of her affairs, her friends and family, and her surroundings.

On Monday, October 15, 2012, Clarence drove Frances to three banks in Greenville and one in Sulphur Springs with the objective of removing Jennifer's name from all of Frances's accounts. They were followed on each trip by James and Sharon, who traveled in their own vehicle and then accompanied Clarence and Frances into the banks. At trial, James offered testimony from the bankers who met with Frances in each institution. At American National Bank ("ANB"), Frances met with Pat Coley. At Chase Bank, Frances met with Kim Simmons. At Alliance Bank, Frances learned that her financial advisor, Matt Mason, was in the bank's Sulphur Springs office for the day. Frances, Clarence, James, and Sharon then proceeded to Sulphur Springs, where Frances met with Mason. Coley, Simmons, and Mason each assisted Frances with the paperwork necessary to remove Jennifer from the accounts. All testified that Frances appeared to understand the transactions she undertook.

But each banker also expressed concerns. Coley "felt uneasy" about the situation, and had a "gut feeling about something that just wasn't right." Simmons had "concerns" about the situation and about "elder abuse," and explained that Frances "appeared red-eyed, watery-eyed; and in the past she had been, you know, pleasant and relaxed. She seemed stressed or tense. I don't know how to explain it. She didn't seem the way she had been the previous times I waited on her."

Nonetheless, neither Coley nor Simmons refused to carry out Frances's instructions. Coley stated that "[i]f I thought something was wrong, I know I wouldn't have" done the paperwork. Similarly, when asked, "If you thought something was truly wrong, that this was not [Frances's] desire or wish, would you have concluded those transactions that day?," Simmons answered "no."

Mason was the most concerned. He was "not okay with the conversation" with Frances, because "[s]he was very nervous" and "[h]er demeanor was not the way she normally acted in a meeting." Although he completed the paperwork for the transactions while Frances was present, he immediately called his supervisor after she left and voiced his concerns. The following day, he called Frances. She did not remember meeting with him the day before. Mason admitted, however, that at the time of trial, the bank was in an ongoing dispute with James or the Trust because Mason did not process the transactions. Further, Clarence had no recollection of Mason's follow-up telephone call.

The following day, Clarence drove Frances to the law offices of Garon Horton. Horton also testified at trial. Frances revoked prior powers of attorney granted to Jennifer and signed a new power of attorney in favor of James. Horton did not have concerns about Frances's understanding of the transactions. He explained, "I felt comfortable that she knew what she was doing, she knew what her options were, and she was making an informed choice and that's the way she wanted it." James and Sharon, again in their own vehicle, met Clarence and Frances in the parking lot as she came out of Horton's office. Sharon testified that she had other business that day with Horton.

That afternoon, Clarence took Frances to her long-time physician, Tom Neal Jones, for treatment for a cough and congestion. The doctor's notes from the visit state, "[t]he patient is demented and cannot relate much history." The notes also reflect that Frances's past medical history includes dementia, and under "review of systems," "psych," Jones reported, "Chronically confused. She has a history of dementia with anorexia." Jones also noted that Frances "looks

disheveled and tired." Jones's notes from a September 19, 2012 visit, also admitted into evidence, reflect that Frances was "being followed pursuant to her dementia," and was "[t]otally dependent on her husband to help with management of her activities of every day living." On the same record, Jones noted that Frances was "confused" and did "not know day, time or year." He also noted that her "[d]ementia with hallucinations and sundowning" had "improved." Under "plan," the doctor noted that although "it has been difficult on her husband," "[h]e is managing well."

The next day, Wednesday, October 17, Jennifer paid an early morning visit to Frances and learned that the accounts had been changed. Jennifer immediately drove Frances to ANB, with James and Sharon following. Frances spoke with both Barbara Denuyl and Joe Winniford at ANB, and both testified at trial. Denuyl testified that Frances did not recall making the changes to her accounts on Monday or even coming to the bank. Winniford, who had known Frances for thirty or forty years, recalled that Frances seemed "rational" and "knew what she wanted," but only recalled discussing Frances's hope that James and Sharon would not be appointed as her guardians. Denuyl assisted Frances in removing James's name from one of the accounts and ensuring that all accounts were in Frances's name only.

Jennifer testified that she and Frances went to Chase Bank on October 17 or 18. Loyd Brigance, Frances's brother, met them there. At Chase Bank, they learned that one of Frances's accounts had been closed, and another had been changed. A Chase banker explained to Frances that two days before, Frances had drawn all of the money (approximately $100,000) out of one of the accounts in a cashier's check. Brigance testified that Frances "argued with the lady at the bank and said no, she did not take it out." At that time, neither Brigance nor Jennifer knew that the money Frances withdrew from Chase had been deposited in an account at ANB as part of the Monday, October 15 transactions. After some discussion, Frances withdrew most of the money from the remaining open account, some $38,000, in the form of a cashier's check. Brigance

testified that Frances placed the check in his safety deposit box "so that she knew where the check was at and she could get it any time she wanted or I'd give it back to her any time she wanted it." Frances then asked Brigance what to do about the missing $100,000 from the closed account. He testified:

> A. And I said, Well, I don't know what's happened to it, you may just have to accept that it's gone and do what you've got with the rest of it, save the rest of it.
>
> And she asked me would I help her, how could she get her money back and what could I do about it?
>
> And I told her, Well, I don't know where it's at. And then that's when she fainted.

Frances was taken to the emergency room of a hospital. There were no further banking transactions that week.

On Friday, October 19, James and Sharon filed an application for guardianship of Frances. Although they had accompanied her to the banks on Monday, they alleged that by Friday:

> Proposed Ward is suffering from a condition referred to as "Chemo-brain." Proposed Ward had breast cancer approximately eight years ago, and was subjected to doses of chemo-therapy to the extent that it killed brain cells and have caused her to lose certain brain functions, and the condition is getting worse. Often Proposed Ward does not know people, even family members. Proposed ward is easily taken advantage of, and will agree with anything that is suggested to her. Proposed ward easily forgets things, and she can not manage her bank accounts and investments.

James and Sharon also alleged that Jennifer had prohibited them from contacting Frances; had removed documentation identifying James as Frances's trustee and potential guardian; and had "taken [Frances] to [her] bank in the last two days and has conducted banking business when [Frances] was clearly unable to understand what was going on."

At trial in this lawsuit, James continued to maintain that Frances was capable and competent to undertake banking transactions on Monday and Tuesday, but not on Wednesday and Thursday. He explained the discrepancy by stating that on Wednesday morning, Clarence had left Frances, causing Frances's rapid decline. Clarence testified that he left "to save his sanity,"

–7–

explaining that he was "living in a fog" and "under great pressure" from Frances's condition and from the ongoing disputes and lawsuits among Frances's family members.

After an evidentiary hearing in the guardianship proceeding, the court appointed Mike Taylor as the guardian of Frances's financial affairs. Loyd Brigance and his wife Linda were appointed as guardians of Frances's person. Both James and Jennifer could, and did, visit Frances. Frances continued to decline, and Clarence returned home in late November. Frances died on November 26, 2012.

On January 31, 2013, the Trustee sued Jennifer, alleging conversion of "$750,000 in annuity benefits" and seeking a temporary restraining order and temporary injunction to prevent her from "spending, disbursing, or securing any further proceeds received from the annuities of New York Life, Genworth Financial or Western National Life Insurance Company that she has received." Jennifer answered and filed counterclaims against the Trustee and against James individually for tortious interference with inheritance rights, intentional breach of fiduciary duty, malicious conversion, common law fraud, theft (under the Texas Theft Liability Act), and money had and received. She also sought exemplary damages and attorney's fees. In an amended counterclaim, Jennifer added a claim for tortious interference with contractual relationship and sought a constructive trust to prevent unjust enrichment.

For a time, a separate lawsuit by the Trustee and James against the banks, insurance companies, and financial services companies that permitted Jennifer to withdraw funds from Frances's accounts was consolidated with this lawsuit. In an amended petition filed January 16, 2015, the Trustee and James asserted claims against Jennifer and the various institutional defendants, and sought "a declaration by this Court as to the rights and legal relations in respect to the accounts made the subject of this suit, including a declaration by this Court that Plaintiffs are the primary beneficiary of the accounts made the subject matter of this suit."

Jennifer first sought a declaratory judgment in her second amended answer and counterclaims filed on July 13, 2016:

> A. Declaratory Judgment - Based on the foregoing allegations, and pursuant to the Uniform Declaratory Judgments Act, Chapter 37 of the Texas Civil Practice and Remedies Code, Green respectfully requests that this Court declare that (i) the Alliance Accounts, Chase Accounts, ANB Accounts, and New ANB Account legally belong to her, and (ii) the October 16, 2012 Power of Attorney is invalid, as well as any transactions or actions related thereto or entered thereunder.

In the same pleading, she sought reasonable and necessary, equitable and just attorney's fees under the Declaratory Judgments Act, Chapter 37 of the civil practice and remedies code.

The case proceeded to trial on July 21, 2016. The trial court heard the testimony of fifteen witnesses over seven days. On October 20, 2016, the trial court rendered judgment for Jennifer. The judgment included numerous declarations regarding each disputed bank and investment account. Further, the trial court's judgment included declarations that:

a. Frances Anderton Buchanan lost her mental capacity to manage all aspects of her property sometime prior to October 15, 2012, and her loss of mental capacity to manage all aspects of her property continued uninterrupted until her death on November 26, 2012.

b. All actions taken by Frances Anderton Buchanan on or after October 15, 2012, at any financial institution or attorney's office, lacked any legal effect and were and are invalid, null, and void.

The trial court awarded Jennifer attorney's fees in the amount of $223,364.31, and additional amounts for appeal. James and the Trustee filed a motion for new trial that was overruled by operation of law. This appeal followed.

## ISSUES

James and the Trustee contend that the trial court erred by (1) finding that Frances lacked capacity to manage all aspects of her property prior to October 15, 2012, and continuing until her

death, and (2) awarding Jennifer her attorney's fees against both James individually and as trustee of the Trust.

### STANDARDS OF REVIEW

We review the legal and factual sufficiency of the evidence to support a trial court's findings by the same standards we apply when reviewing evidence supporting a jury's verdict. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Long v. Long*, 196 S.W.3d 460, 464 (Tex. App.—Dallas 2006, no pet.). In reviewing a challenge to the legal sufficiency of the evidence, we consider evidence that supports the finding if a reasonable fact-finder could have considered it and disregard contrary evidence unless a reasonable fact-finder could not have disregarded it. *See Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 115 (Tex. 2009) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)); *Wright Grp. Architects–Planners, P.L.L.C. v. Pierce*, 343 S.W.3d 196, 199 (Tex. App.—Dallas 2011, no pet.). We will sustain a legal sufficiency challenge "when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact." *Akin, Gump*, 299 S.W.3d at 115 (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). Evidence is no more than a scintilla if it is "'so weak as to do no more than create a mere surmise or suspicion' that the fact exists." *Id.* (quoting *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006)).

In reviewing a challenge to the factual sufficiency of the evidence, we consider all of the evidence in the record, both supporting and contradicting the challenged finding, and will set aside the finding only if we determine that the evidence supporting the finding is so against the great

–10–

weight and preponderance of the evidence as to make the finding clearly wrong and manifestly unjust. *See Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996) (per curiam).

In a bench trial, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Wright Grp.*, 343 S.W.3d at 199. We are not a fact-finder and may not pass upon the credibility of the witnesses or substitute our judgment for that of the trier of fact, even if the evidence would support a different result. *Id.* When the evidence is conflicting, we must presume that the fact-finder resolved the inconsistency in favor of the finding if a reasonable person could do so. *See City of Keller*, 168 S.W.3d at 821; *Wright Grp.*, 343 S.W.3d at 199.

We review de novo a trial court's conclusions of law. *See BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). We are not bound by the trial court's legal conclusions, but the conclusions of law will be upheld on appeal if the judgment can be sustained on any legal theory supported by the evidence. *Fulgham v. Fischer*, 349 S.W.3d 153, 157–58 (Tex. App.—Dallas 2011, no pet.). Incorrect conclusions of law will not require reversal if the controlling findings of fact will support a correct legal theory. *See id*. Moreover, conclusions of law may not be reversed unless they are erroneous as a matter of law. *Id.*

## DISCUSSION

### 1. Sufficiency of the evidence

James and the Trustee contend the evidence was insufficient to support the trial court's finding that Frances lacked the requisite mental capacity to manage her property on October 15, 2012. They rely on testimony by numerous witnesses that Frances appeared to understand the transactions she undertook during the week of October 15, 2012. Jennifer responds with evidence from some of the same witnesses and others who testified to their concerns about Frances's mental capacity before, on, and after October 15, 2012.

Documents executed by one who lacks sufficient legal or mental capacity may be avoided. *Kinsel v. Lindsey*, 526 S.W.3d 411, 419 (Tex. 2017). To have mental capacity, the person executing the instrument must have had sufficient mind and memory to understand the nature and effect of her act at the time of the document's execution. *Decker v. Decker*, 192 S.W.3d 648, 652 (Tex. App.—Fort Worth 2006, no pet.). Capacity may be assessed by considering such factors as 1) the person's outward conduct demonstrating an "inward and causing condition," 2) preexisting external circumstances tending to produce a special mental condition, and 3) the person's mental condition before or after the relevant point in time from which her mental capacity or incapacity may be inferred. *Sanders v. Sanders*, No. 02-08-00201-CV, 2010 WL 4056196, at *2 (Tex. App.—Fort Worth Oct. 14, 2010, no pet.) (mem. op.). Finally, expert testimony on the matter is not required since the requisite proof regarding mental capacity may reside within the common knowledge and experience of laypersons. *Decker*, 192 S.W.3d at 652; *Jackson Walker, LLP v. Kinsel*, 518 S.W.3d 1, 16 (Tex. App.—Amarillo 2015), *aff'd and remanded sub nom. Kinsel v. Lindsey*, 526 S.W.3d 411 (Tex. 2017).

The record includes ample evidence to support the trial court's findings, conclusions, and declarations regarding Frances's mental capacity before, on, and after October 15 and 16, 2012. As discussed above, witnesses testified that in 2012, Frances was unable to recall that she was married to Clarence; that "Jennifer Green" was her granddaughter; or that she had, one or two days prior, undertaken significant banking transactions, including moving $100,000 from one bank to another and changing her long-settled plan that Jennifer would be "taken care of" through investments managed by Mason. Although there was also conflicting evidence of Frances's capacity to understand the transactions she undertook, including attorney Horton's testimony that Frances knew and intended on October 16 to revoke her power of attorney to Jennifer, on the same day Frances's doctor noted that Frances was "demented and cannot relate much history," and

–12–

looked "disheveled and tired." We must presume that the trial court resolved these and other inconsistencies in favor of its findings. *See City of Keller*, 168 S.W.3d at 821; *Wright Grp.*, 343 S.W.3d at 199.

We conclude the evidence supports the trial court's declarations that Frances "lost her mental capacity to manage all aspects of her property sometime prior to October 15, 2012, and her loss of mental capacity to manage all aspects of her property continued uninterrupted until her death on November 26, 2012," and that Frances's actions on or after October 15, 2012 "at any financial institution or attorney's office, lacked any legal effect and are invalid, null, and void." We decide appellants' first issue against them.

## 2.    Award of attorney's fees

James and the Trustee argue that the trial court's award of attorney's fees to Jennifer was error because (1) there was no basis to award fees against James individually; (2) the amount of fees awarded was not reasonable; and (3) Jennifer failed to segregate her recoverable fees. James and the Trustee also argue that they timely preserved their objection to Jennifer's failure to segregate her fees.[4]

Under section 37.009 of the civil practice and remedies code, a trial court may award attorney's fees to a party in a declaratory judgment action, including a party who successfully defends against a declaratory judgment claim, if the trial court believes such fees to be reasonable

---

[4] James and the Trustee did not object to Jennifer's failure to segregate her attorney's fees until after the trial court made its ruling awarding her fees. Jennifer argues that the objection was too late to preserve error. James and the Trustee respond that they did not waive error because they objected before the trial court rendered final judgment. Objections to the failure to segregate can be waived. *Green Int'l v. Solis*, 951 S.W.2d 384, 389 (Tex. 1997). Generally, an objection must be made "timely" in the trial court to preserve a complaint for appellate review. TEX. R. APP. P. 33.1(a)(1). A "timely" objection is "one 'interposed at a point in the proceedings which gives the trial court the opportunity to cure any alleged error.'" *Crews v. Dkasi Corp.*, 469 S.W.3d 194, 201 (Tex. App.—Dallas 2015, pet. denied) (quoting *Driver v. Conley*, 320 S.W.3d 518, 518 n.3 (Tex. App.—Texarkana 2010, pet. denied)). By the time James and the Trustee made their objection, the evidence was closed, trial had concluded, and the trial court had already made its ruling awarding Jennifer her fees. Nonetheless, the objection was made at a time when the trial court could, and did, rule on it, stating in a letter to the parties that "Attorney Fees are not limited to legal work segregated to the declaratory judgment action." One of our sister courts has noted that "there is as yet no consistent rule about when an objection to the failure to segregate attorneys' fees must be raised in a case tried without a jury," *Home Comfortable Supplies, Inc. v. Cooper*, 544 S.W.3d 899, 908 (Tex. App.—Houston [14th Dist.] 2018, no pet.), and some courts have ruled that an objection to failure to segregate must be made "before the trial court issues its ruling." *Huey-You v. Huey-You*, No. 02-16-00332-CV, 2017 WL 4053943, at *2 (Tex. App.—Fort Worth Sept. 14, 2017, no pet.) (mem. op.); *see also Cooper*, 544 S.W.3d at 908–09 (collecting cases). But on this record, we conclude James and the Trustee did not waive their appellate complaint.

and necessary and the award of such fees to be equitable and just. TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (West 2015); *Jarvis v. Rocanville Corp.*, 298 S.W.3d 305, 317 (Tex. App.—Dallas 2009, pet. denied). When a trial court sits as the trier of fact, the amount of a fee award generally rests in the sound discretion of the trial court, and its judgment will not be reversed on appeal absent a clear abuse of discretion. *Id.* at 318. Sufficiency of the evidence to support the award is a relevant factor in assessing whether the trial court abused its discretion. *Id.*

James and the Trustee first sought a declaration that "plaintiffs are the true beneficiary" of Frances's accounts on January 28, 2015, after the trial court granted Jennifer's motion to consolidate James's and the Trustee's separate suit against Alliance Bank, Mason, and other financial institutions and insurance companies, who in turn had asserted third-party claims against Jennifer. Also after consolidation, Mason and two Alliance Bank entities sought a declaration that "Plaintiffs are judicially estopped and quasi-estopped from pleading that Frances Anderton Buchanan was of clear mind on October 15, 2012." On July 12, 2016, James "in all capacities" filed a first amended petition against Jennifer, alleging numerous causes of action and requesting a declaratory judgment "to have the Court determine the rights of the parties to such assets, including the Alliance Annuity Accounts, the bank accounts, and the house." Jennifer responded the following day, filing a second amended answer and counterclaims that included a request for a declaratory judgment that the accounts in question "legally belong to her," and "the October 16, 2012 Power of Attorney is invalid, as well as any transactions or actions related thereto or entered thereunder." The case proceeded to trial on July 21, 2016.

## A. Individual's liability for fees

James challenges the trial court's judgment that Jennifer "shall have and recover" her attorney's fees "from James Anderton individually and from the Trust, jointly and severally, and

that Anderton shall pay to Green in his individual capacity and as Trustee of the Trust, attorneys' fees for services rendered through trial" and appeals. James argues:

- he did not bring a declaratory judgment claim in his personal capacity, only as Trustee;

- he never made any claim, personally, to the funds at issue;

- "there was never any actual dispute with respect to any of the declaratory judgment claims" between Jennifer and James, individually;

- a declaratory judgment claim cannot be used to recover fees for claims on which fees are not otherwise recoverable, and

- the award was not necessary, reasonable, equitable, or just, because there was no live controversy between James and Jennifer.

But James's and the Trustee's operative petition alleges in its first paragraph, "COMES NOW James Anderton *in all capacities* and files his First Amended Petition . . . ," and concludes with the request that "James Anderton *in all capacities* respectfully requests the Court enter a judgment against Jennifer Green." (Emphasis added). Plaintiffs allege "[a]t the time of her death, Frances intended *James and* the Trust to be the beneficiary of the annuities." (Emphasis added). They allege that "*James Anderton and* the Anderton Trust have sustained damages in the amount of approximately $750,000, plus the bank account balances . . . as a direct result of Jennifer Green's actions." (Emphasis added). And although the declaratory judgment is requested by the Trustee, the relief sought is "to have the Court determine the rights *of the parties to such assets*, including the Alliance Annuity Accounts, the bank accounts, and the house." (Emphasis added). Further, Jennifer sought a declaratory judgment against both the Trustee and James, individually, that the accounts "legally belong to her."

The trial court heard testimony from all witnesses, including James, about James's actions and intentions during the week of October 15, including accompanying his mother to the banks and attorney's office on Monday and Tuesday, following Jennifer and Frances on Wednesday, and

filing a guardianship proceeding in which he alleged his mother's incompetence on Friday. The trial court also heard evidence that James, individually, not only was a beneficiary of the Trust, but was the sole beneficiary after settling a lawsuit with his brother. On the basis of this evidence, the trial court could have found and concluded that an award of attorney's fees against James individually as well as against the Trustee was reasonable and necessary, and equitable and just. *See Ridge Oil Co., Inc. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 161–62 (Tex. 2004) (reasonable and necessary requirements are questions of fact; equitable and just requirements are questions of law).

Further, we reject James's argument that Jennifer "use[d] Sec. 37.009 to sneak in an award of attorney's fees for claims that otherwise would not be eligible for such an award." James relies on *Hartford Casualty Insurance Co. v. Budget Rent-A-Car Systems, Inc.*, 796 S.W.2d 763, 772 (Tex. App.—Dallas 1990, writ denied), in support of this contention. Our ruling in that case followed the principle that "[a] declaratory relief plea may not be coupled to a damage action simply in order to pave the way to recover attorney's fees." *Id.* (citing *John Chezik Buick Co. v. Friendly Chevrolet Co.*, 749 S.W.2d 591, 594–95 (Tex. App.—Dallas 1988, writ denied)). But as we have explained, it is within a trial court's discretion to award fees to a party who successfully defends against a declaratory judgment action, as Green did here. *See Jarvis*, 298 S.W.3d at 317; TEX. CIV. PRAC. & REM. CODE ANN. § 37.009; *see also Garden Oaks Maint. Org. v. Chang*, 542 S.W.3d 117, 141 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("In exercising its discretion in a declaratory-judgment action, a trial court may award attorney's fees to the prevailing party, may decline to award attorney's fees to either party, or may award attorney's fees to the nonprevailing party, regardless of which party sought declaratory relief." [internal quotation omitted]). Consequently, our holding in *Hartford Casualty Insurance* does not preclude an award of attorney's fees to Jennifer, and we decide this portion of James's and the Trustee's second issue against them.

### B.    Failure to segregate

James and the Trustee next argue that there is no evidence of recoverable attorney's fees because Jennifer "did not segregate her attorney's fees when she put them on at trial," and she "put on no evidence of how such fees would be segregated." Jennifer's attorneys did not offer evidence to segregate their recoverable and unrecoverable fees, only arguing in closing that "all of the work" they performed "was intertwined with the declaratory judgment action."

"[I]f any attorney's fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313 (Tex. 2006). The supreme court has explained, "[i]n *Chapa* we reestablished the rule that attorney's fees are recoverable only if necessary to recover on a contract or statutory claim allowing them, and eliminated the exception for fees incurred solely on separate but arguably intertwined claims." *Varner v. Cardenas*, 218 S.W.3d 68, 69 (Tex. 2007) (per curiam) (citing *Chapa*, 212 S.W.3d at 313). Citing *Varner* and *Chapa*, we explained in *Hejin Hong v. Nations Renovations, LLC*, No. 05-15-01036-CV, 2016 WL 7473900, at *6 (Tex. App.—Dallas Dec. 29, 2016, pet. denied) (mem. op.):

> When claims allowing recovery of fees are brought with claims that do not, any attorney's fees relating solely to a claim for which fees are not recoverable must be segregated from the fees relating to recoverable claims. [*Chapa*, 212 S.W.3d] at 313. Intertwined facts do not allow recovery of unrecoverable fees; "it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated." *Id.* at 313–14. Legal services that would have been incurred on a recoverable claim are not disallowed simply because the services also further non-recoverable claims. *Id.* Further, fees incurred to "overcome any and all affirmative defenses" or to defend against a counterclaim that must be overcome to fully recover on the claim allowing fees do not require segregation. *See Varner*[, 218 S.W.3d at 69–70]; *Chapa*, 212 S.W.3d at 314.

Consequently, Jennifer's attorney's argument that her fees were "intertwined" was an insufficient basis for the trial court's award. *See Varner*, 218 S.W.3d at 69. But neither should the trial court have disallowed all fees "simply because the services also further[ed] non-recoverable

–17–

claims." *Hejin Hong*, 2016 WL 7473900, at *6. Jennifer offered some evidence of her recoverable fees through her attorneys' testimony and supporting documentation, including the testimony of Morris Sheats and Robert Scott and exhibits 9A and 9B, all admitted into evidence without objection. "Unsegregated attorney's fees for the entire case are some evidence of what the segregated amount should be." *Chapa*, 212 S.W.3d at 314. Under these circumstances, remand is required to determine the recoverable amount. *Id.* As the supreme court has explained, "[t]he issue may be remanded to the trial court for reconsideration with sufficiently detailed information for a meaningful review of the fees sought." *Kinsel*, 526 S.W.3d at 428. Accordingly, we sustain James's and the Trustee's second issue in part and remand the case to the trial court for determination of recoverable fees. *See id.* (ordering remand "for reconsideration of the attorneys-fees award"); *Chapa*, 212 S.W.3d at 314–15 (same); *Allan v. Nersesova*, 307 S.W.3d 564, 573–74 (Tex. App.—Dallas 2010, no pet.) (same).

CONCLUSION

We reverse the portion of the trial court's judgment awarding attorney's fees to Jennifer and remand the case for further proceedings on that issue. In all other respects, we affirm the trial court's judgment.


/Elizabeth Lang-Miers/
ELIZABETH LANG-MIERS
JUSTICE


170024F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JAMES D. ANDERTON, INDIVIDUALLY AND AS THE TRUSTEE OF THE JIMMIE W. ANDERTON AND FRANCES E. ANDERTON REVOCABLE LIVING TRUST AGREEMENT, Appellants

No. 05-17-00024-CV      V.

JENNIFER GREEN, Appellee

On Appeal from the 354th District Court, Hunt County, Texas
Trial Court Cause No. 79011.
Opinion delivered by Justice Lang-Miers; Chief Justice Wright and Justice Whitehill, participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part and **REVERSED** in part. We **REVERSE** that portion of the trial court's judgment awarding attorney's fees to Jennifer Green. In all other respects, the trial court's judgment is **AFFIRMED**. We **REMAND** this cause to the trial court for further proceedings consistent with this opinion.

It is **ORDERED** that appellee Jennifer Green recover her costs of this appeal from appellants James D. Anderton, Individually and as the Trustee of the Jimmie W. Anderton and Frances E. Anderton Revocable Living Trust Agreement.

Judgment entered this 23rd day of July, 2018.