**AFFIRMED and Opinion Filed May 4, 2022**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-20-00215-CV

**MARSHA DENISE DILLON, BENEFICIARY, ON BEHALF OF THE
ESTATE OF BASKIN J. CULPEPPER AND MARSHA DILLON,
INDIVIDUALLY, Appellant
V.
KIMBERLY KING, Appellee**

**On Appeal from the Probate Court No. 2
Dallas County, Texas
Trial Court Cause No. PR-17-01307-2**

## MEMORANDUM OPINION

Before Justices Schenck, Smith, and Garcia
Opinion by Justice Garcia

This is a lawsuit between two sisters: appellant Marsha Dillon and appellee
Kimberly King. Dillon contested their father's will and codicil and also asserted
other claims against King. After a bench trial, the trial judge admitted the will and
codicil to probate and ordered Dillon to take nothing on her other claims. Dillon
appeals and asserts seven issues. We affirm.

# I. Background

## A. Facts

The trial evidence supported the following facts.

Dillon and King are the adult daughters of Baskin Culpepper, who was born in 1936. In April 2010, his wife of fifty-two years died. At that time, Culpepper and King lived near each other in Alaska, and Dillon lived in Dallas, Texas.

In December 2010, Culpepper visited Dillon in Texas and then decided to move there. In February 2011, he bought a house in Texas but did not move there right away. In September 2011, he executed a will in Kenai, Alaska. This will left all of his property to King and Dillon in equal shares. That same month, he moved to Texas.

In October 2011, Culpepper began seeing Dr. Richard Ahn in Texas. Medical records were admitted into evidence and reflect that Culpepper had certain mental-health problems both at that time and thereafter. We discuss those records in more detail in our sufficiency-of-the-evidence analysis below.

In February 2012, Culpepper executed a document giving King a general power of attorney.

In or about August 2012, someone contacted Texas Adult Protective Services (TAPS) with concerns about the amounts of money that were being withdrawn from Culpepper's Wells Fargo account. TAPS investigated the report, and Culpepper told

TAPS that he had allowed Dillon to use his account and that Dillon no longer had access to the account. TAPS eventually closed the case.

In or about October 2012, Culpepper traveled to Alaska and met with his financial planner and with an attorney. On October 30, 2012, while still in Alaska, Culpepper executed a codicil to his will that disinherited Dillon and left all of his property to King.

Culpepper was admitted to a memory-care facility in December 2013 and then was moved into assisted living in about April 2014. He died in Dallas County on November 25, 2016.

## B. Procedural History

### 1. The 2017 Case

In April 2017, Dillon filed an application for letters of administration in which she averred that Culpepper had died intestate. The case was assigned number PR-17-01307-2. A month later, King filed an application for probate and issuance of letters testamentary with a copy of the will and codicil attached. Dillon answered, alleging that (1) Culpepper lacked testamentary capacity when he allegedly signed the will and the codicil and (2) King exercised undue influence over him to sign the codicil.

A bench trial began on June 11, 2018. It was then discovered that the originals of the will and the codicil had not been filed and that King's application did not expressly request that the codicil be admitted to probate.

The trial did not resume. Instead, over the next few days, the original will and the original codicil were filed with trial court, as well as a Rule 11 agreement that the will could be admitted to probate and King would act as independent executor. King also filed an amended application to probate both the will and the codicil.

### 2. The 2019 Case

In January 2019, Dillon, acting on behalf of Culpepper's estate, filed an original petition against King asserting claims for breach of fiduciary duty, unjust enrichment, conversion, violations of the Texas Theft Liability Act, and fraud. The 2019 Case was assigned to the same trial court as the 2017 Case and given case number PR-19-00179-2.

King answered and counterclaimed against Dillon. She later amended her pleading to add more counterclaims.

A June 2019 scheduling order set the 2019 Case for trial on January 21, 2020.

Dillon filed an amended petition. She continued to assert the same claims but added that she was suing in her individual capacity as well as on behalf of Culpepper's estate.

### 3. Consolidation and Trial

In September 2019, the trial judge sua sponte consolidated the 2019 Case into the 2017 Case.

In January 2020, the consolidated case was tried without a jury. At the beginning of the trial, the judge heard and denied Dillon's motions to exclude and

to strike King's expert witness, Jeremy Cassius. Then, during the first witness's testimony, Dillon objected to certain testimony based on deemed admissions by King. After a hearing, the judge allowed King to withdraw the deemed admissions and also ordered a brief continuance to allow Dillon to depose Cassius.

After the trial, the trial judge signed an order admitting both the will and the codicil to probate. The judge also signed a judgment ordering Dillon to take nothing on her claims against King and ordering King to take nothing on her counterclaims against Dillon.

Dillon timely requested findings of fact and conclusions of law. When the trial judge did not issue findings and conclusions, Dillon timely filed a notice of past due findings and conclusions. *See* TEX. R. CIV. P. 297. The trial judge still did not issue any findings or conclusions.

Dillon timely appealed. One of her issues complained about the trial judge's failure to issue findings of fact and conclusions of law. We abated the appeal and ordered the trial judge to make findings of fact and conclusions of law, which she did. We summarize some of the key findings and conclusions as follows:

- Culpepper satisfied the elements of testamentary capacity.

- Dillon did not prove that King exerted undue influence over Culpepper at the time he executed the codicil.

- Dillon lacked standing to assert claims for breach of fiduciary duty, conversion, and fraud by nondisclosure on behalf of Culpepper's estate. Dillon also failed to prove some essential elements of those claims.

–5–

- Dillon lacked capacity to assert claims for violations of the Texas Theft Liability Act and for unjust enrichment on behalf of Culpepper's estate. Dillon also failed to prove some essential elements of those claims.

Dillon subsequently filed an amended brief, as did King. We review the trial court's judgment based on the amended briefs.

## II. Issues Presented

Dillon presents seven issues on appeal, which we summarize as follows:

1. Was the evidence legally and factually sufficient to support the finding of testamentary capacity?

2. Was the evidence legally and factually sufficient to support the finding of mental or contractual capacity?

3. Did the trial judge err by admitting Jeremy Cassius's opinions as expert testimony on testamentary capacity and undue influence?

4. Did the trial judge err by ordering the will and codicil to be probated?

5. Did the trial judge err by allowing King to withdraw her deemed admissions?

6. Did the trial judge err by denying Dillon's motion to compel discovery responses?

7. Did Dillon have standing and capacity to bring claims on behalf of Culpepper's estate?

Issue four is preceded by the heading "Evidentiary Error." However, the argument section of Dillon's brief does not purport to address issue four, nor does Dillon argue that the trial judge's order that the will and codicil be probated constituted an evidentiary error. Thus, we overrule issue four because it is not briefed. *See* TEX. R. APP. P. 38.1(i).

–6–

### III.    Withdrawal of Deemed Admissions

In Dillon's fifth issue, she argues that the trial court erred by allowing King to withdraw deemed admissions. We disagree, for the following reasons.

### A.    Applicable Law

After an action is filed, a party may serve another party with requests for admissions regarding any matter within the scope of discovery, including statements of opinion, fact, or application of law to fact. *See* TEX. R. CIV. P. 198.1. If the responding party does not respond to the requests within thirty days, the requested matters are deemed admitted by the responding party without the need for a court order. *See id*. 198.2(a), (c). A matter deemed admitted is conclusively established as to the party making the admission unless the court allows the party to withdraw or amend the admission. *See id*. 198.3.

Generally, the trial court may allow a party to withdraw or amend an admission if (1) that party shows good cause; (2) the party relying on the admission will not be unduly prejudiced; and (3) withdrawal or amendment will subserve the presentation of the action's merits. *See id*.

The good-cause element ordinarily requires a showing that the failure involved was an accident or mistake rather than intentional or the result of conscious indifference. *See Marino v. King*, 355 S.W.3d 629, 633 (Tex. 2011) (per curiam). However, when deemed admissions are merits-preclusive, the trial court must allow their withdrawal unless the party requesting withdrawal acted with flagrant bad faith

or callous disregard of the rules. *Torres v. Lee*, No. 05-18-00631-CV, 2020 WL 38832, at \*4 (Tex. App.—Dallas Jan. 3, 2020, no pet.) (mem. op.) (citing *Wheeler v. Green*, 157 S.W.3d 439, 443 (Tex. 2005) (per curiam)). This standard means that the party was mindful of pending deadlines and either consciously or flagrantly failed to comply with the rules. *See id*. And the party seeking to rely on the admissions bears the burden of proving flagrant bad faith or callous disregard of the rules. *Time Warner, Inc. v. Gonzalez*, 441 S.W.3d 661, 666 (Tex. App.—San Antonio 2014, pet. denied).

The trial court has broad discretion to permit or deny the withdrawal of deemed admissions. *Marino*, 355 S.W.3d at 633. The court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to guiding rules and principles. *Id*.

**B.    The Pertinent Facts of This Case**

Under the scheduling order, the discovery cut-off was December 22, 2019, and trial was set for January 21, 2020.

On November 11, 2019, Dillon served sixty-two requests for admissions on King. They included requests that King admit that (1) Culpepper lacked capacity when he signed the codicil, (2) King unduly influenced Culpepper to sign the codicil, (3) King was unjustly enriched by having Culpepper sign the codicil, (4) King breached her fiduciary duty to Culpepper, and (5) King's fiduciary breach caused damage or injury to Culpepper and/or his estate.

–8–

On December 20, 2019, Dillon filed a summary-judgment motion based on deemed admissions. On December 31, 2019, King served her responses to Dillon's request for admissions. A few days later, King filed a motion to withdraw the deemed admissions. The record indicates that Dillon's summary-judgment motion was never heard.

Trial began January 22, 2020. At 9:02 that morning, Dillon filed a response to King's motion to withdraw the deemed admissions. When the trial judge took up pre-trial motions, neither side mentioned King's motion to withdraw the deemed admissions. After lunch, the parties made opening statements, and King called her first witness. Relying on King's deemed admissions, Dillon objected to any testimony pertaining to whether Culpepper had capacity. After some discussion, the judge continued the trial and set King's motion to withdraw for hearing the following afternoon.

On January 23, 2020, the trial judge heard King's motion to withdraw deemed admissions. At the end of the hearing, the judge granted King's motion and signed an order to that effect. The judge also continued the trial until January 27 to allow Dillon time to depose King's expert witness.

## C. Applying the Law to the Facts

### 1. At least some of the requests were merits preclusive.

The determination of whether Dillon's requests for admissions were merits preclusive is essential to our analysis because it establishes the rules that govern the

trial court's discretionary decision. Although Dillon does not squarely address that question, her brief includes an argument that she satisfied the flagrant-bad-faith test for denying the withdrawal of merits-preclusive admissions.

We conclude that at least some of the requests for admissions at issue in this case were merits-preclusive requests. For example, Dillon asked King to admit that Culpepper lacked capacity when he signed the codicil, that King unduly influenced Culpepper to sign the codicil, and that King was unjustly enriched by having Culpepper sign the codicil. These were ultimate issues in the case.

Dillon does not argue that any particular requests for admissions were not merits preclusive. And even if some of her requests were not merits preclusive, Dillon does not argue that the trial court's order regarding those requests caused any harm. *See* TEX. R. APP. P. 44.1 (harmful-error rule); *see also In re C.F.M.*, No. 05-16-00285-CV, 2018 WL 1704202, at *13 (Tex. App.—Dallas Apr. 9, 2018, pet. denied) (mem. op.) (appellant's failure to brief harm waived complaint).

Because at least some of Dillon's requests for admissions were merits preclusive, and because Dillon does not argue that that she was harmed by the trial court's ruling as to any non-merits-preclusive requests, we review the trial court's ruling solely under the rules governing merits-preclusive deemed admissions.

### 2. The trial judge did not abuse her discretion by concluding that Dillon had not shown flagrant bad faith or callous disregard.

Dillon bore the burden to show that King acted with bad faith or callous disregard in failing to timely answer Dillon's requests for admissions. *See Time*

*Warner, Inc.*, 441 S.W.3d at 666. She argues that she carried her burden by pointing to numerous examples of other misbehavior by King in this litigation. *See Soto v. Gen. Foam & Plastics Corp.*, 458 S.W.3d 78, 84–85 (Tex. App.—El Paso 2014, no pet.) (upholding denial of motion to withdraw, in part because appellant had refused to comply with other discovery requests despite his own attorney's urging him to comply). Dillon's brief lists fourteen alleged examples of misconduct. In response, King points to her attorney's contention at the hearing that the failure to respond to the requests for admissions was not malicious but happened because King herself was very busy at work and because Dillon had served discovery requests that required a great deal of effort to respond to.

We conclude that Dillon has not shown an abuse of discretion. Although evidence of a party's pattern of misconduct may be some evidence that a party was guilty of flagrant bad faith or callous disregard on one specific occasion, the trial judge has broad discretion to weigh the importance of that factor in a particular case.

Here, Dillon's lawyer asserted that King had shown "a clear, obvious and voluminous pattern of abusing and breaching the Rules of Civil Procedure" and the trial court's orders. He discussed a few of King's alleged abuses, specifically (1) King's failure to respond to Dillon's November 11, 2019 discovery requests, (2) King's opposition to Dillon's motion for continuance of the trial, which was based on King's failure to respond to discovery requests, and (3) King's failure to pay $2,000 in attorney's fees as previously ordered by the court. But even assuming

–11–

that his discussion of those facts constituted evidence of them, we note that there were other countervailing facts for the trial court to consider. For example, King did not completely disregard the requests for admissions but did respond to them, albeit late. King also filed a motion to withdraw the deemed admissions, and although she did not raise that motion along with the other pretrial motions, she explained that she did not because Dillon had not listed deemed admissions among her trial exhibits. The trial judge could reasonably conclude that King's attorney's explanation for the late responses was more indicative of negligence than of flagrant bad faith or callous disregard for the rules.

Considering the record as a whole and the broad discretion accorded to the trial judge, we conclude that Dillon has not shown that the trial judge abused her discretion by refusing to find King guilty of flagrant bad faith or callous disregard for the rules.

**3. The trial judge did not abuse her discretion by concluding that Dillon would not be unduly prejudiced by allowing King to withdraw the deemed admission.**

Finally, Dillon argues that the trial judge abused her discretion because allowing King to withdraw the deemed admissions unduly prejudiced Dillon. We disagree.

The San Antonio Court of Appeals thoroughly analyzed the undue-prejudice element in *Time Warner, Inc.*, 441 S.W.3d at 668–69. Requests for admissions are properly used to eliminate matters about which there is no real controversy but that

may be difficult or expensive to prove and to address uncontroverted matters like the authenticity of documents. *Id*. at 668. They are not properly used to demand that a party admit that she has no cause of action or ground of defense. *Id*. (citing *Stelly v. Papania*, 927 S.W.2d 620, 622 (Tex. 1996) (per curiam)). Thus, when the party requesting admissions knows or should know that the requests are improper in this regard, that party cannot be said to have relied on the admissions in deciding not to otherwise develop the evidence. *Id*. at 668–69. Although that party may be prejudiced if the opposing party is permitted to withdraw the admissions during trial, that prejudice is not undue. *Id*. at 669.

Here, the trial judge could reasonably have concluded that Dillon should have known her merits-preclusive requests for admissions were improper. Moreover, Dillon had received King's late responses and motion to withdraw the deemed admissions, so she was aware that King disputed some matters that had been deemed admitted and that the trial judge might allow the deemed admissions to be withdrawn.

We conclude that the trial judge did not abuse her discretion by concluding that Dillon would not be unduly prejudiced if King were allowed to withdraw the deemed admissions.

## D. Conclusion

We overrule Dillon's fifth issue.

## IV.    Admission of Cassius's Testimony

We next address Dillon's third issue, in which she raises three distinct arguments challenging the trial judge's decision allowing Jeremy Cassius to testify as an expert witness: (1) King did not timely designate Cassius, (2) Cassius was unqualified to testify as an expert, and (3) Cassius's opinions were not based on a sufficient and reliable foundation. We reject her arguments for the following reasons.

### A.    Did the trial judge abuse her discretion by overruling Dillon's late-designation objection?

Dillon argues that the trial judge erred by allowing Cassius to testify because King did not timely designate Cassius as an expert witness in discovery.

### 1.    Applicable Law

Rule 193 provides that "[a] party who fails to make, amend, or supplement a discovery response, including a required disclosure, in a timely manner may not introduce in evidence the material or information that was not timely disclosed, or offer the testimony of a witness (other than a named party) who was not timely identified." TEX. R. CIV. P. 193.6(a). As to timeliness, Rule 195 provides that the trial judge may make an order setting the parties' deadlines to designate experts. *Id*. 195.2. A party can avoid the sanction of automatic exclusion if the judge finds either that there was good cause for the failure or that the failure will not unfairly surprise or unfairly prejudice the other parties. *See id*. 193.6(a)(1)–(2).

We review the trial judge's decision to admit evidence over a Rule 193.6 challenge for abuse of discretion. *Ramirez v. Welch*, No. 05-16-00681-CV, 2018 WL 3725254, at *2 (Tex. App.—Dallas Aug. 6, 2018, no pet.) (mem. op.).

### 2. Analysis

Dillon's argument runs as follows: In the 2019 Case, a June 2019 scheduling order required King to designate expert witnesses by September 22, 2019. But King did not designate Cassius until an expert designation filed on November 22, 2019. Additionally, according to discussion at the hearing, King served an amended disclosure on December 24, 2019, that omitted Cassius. Because King did not show good cause for, or a lack of unfair surprise or prejudice from, the late designation, according to Dillon, the trial judge erred by denying Dillon's motion to strike Cassius's late designation. *See* Tex. R. Civ. P. 193.6.

King responds that in April 2018 she designated Cassius as an expert in the 2017 Case to testify about Culpepper's mental status and health. In September 2019, the trial court consolidated the 2019 Case into the 2017 Case. Thus, King's April 2018 designation of Cassius in the 2017 Case was timely under the 2019 Case's scheduling order, which required King to designate her experts by September 22, 2019. Alternatively, Dillon cannot have been surprised or prejudiced by King's allegedly late designation of Cassius in November 2019 because Dillon had already received the designation in April 2018.

We conclude first that the trial judge could have reasonably determined that King's April 2018 designation of Cassius in the 2017 Case was a timely designation. Dillon's appellate brief acknowledges that King designated Cassius as an expert on April 12, 2018. And the 2017 Case is the one in which Dillon challenged Culpepper's capacity, which is the issue about which Cassius was to testify. Once the 2017 Case and the 2019 Case were consolidated, they were merged and were properly treated thereafter as one suit. *See Amir-Sharif v. Cadieux*, No. 05-14-01055-CV, 2015 WL 1346154, at *1 (Tex. App.—Dallas Mar. 25, 2015, no pet.) (mem. op.). The trial judge reasonably could have concluded that all of the parties' expert designations in both cases should be considered for Rule 193.6 purposes, and so the April 2018 designation was timely.

As for King's apparent failure to list Cassius in a post-consolidation amended disclosure on December 24, 2019, we conclude that the trial judge could have reasonably determined that Dillon would not be unfairly surprised or prejudiced by allowing Cassius to testify despite that omission. *See* Tex. R. Civ. P. 193.6(a)(2). King designated Cassius in April 2018 and again on November 22, 2019, which was a month before the December 22, 2019 discovery deadline. King's apparent failure to include Cassius in an amended disclosure served after the discovery deadline could not have affected Dillon's discovery decisions about Cassius. Moreover, after denying Dillon's motion to strike but before Cassius testified at trial, the trial judge ordered a brief continuance to allow Dillon to depose Cassius. *See* Tex. R. Civ. P.

193.6(c) (authorizing continuance to allow opposing parties to conduct discovery regarding new information). Although such an order does not always ensure the absence of unfair surprise or prejudice, *see PopCap Games, Inc. v. MumboJumbo, LLC*, 350 S.W.3d 699, 718 (Tex. App.—Dallas 2011, pet. denied), the judge could have reasonably determined that allowing Dillon to depose Cassius ameliorated any unfair prejudice in this particular case, given that King had designated him in April 2018 and, according to King's lawyer, Dillon had never deposed him.

For these reasons, we hold that the trial judge did not abuse her discretion by denying Dillon's motion to strike Cassius's designation as untimely.

**B.     Did the trial judge abuse her discretion by ruling that Cassius was qualified to testify about Culpepper's mental abilities?**

Dillon contends that Cassius was not qualified to testify as an expert about Culpepper's testamentary capacity or susceptibility to undue influence and that the trial judge erred by denying her motion to exclude Cassius's testimony.

**1.     Applicable Law**

To testify as an expert, a witness must be qualified "by knowledge, skill, experience, training, or education," such that his or her testimony will assist the trier of fact. TEX. R. EVID. 702. This means that the expert must possess special knowledge as to the very matter on which the expert proposes to give an opinion. *Broders v. Heise*, 924 S.W.2d 148, 152–53 (Tex. 1996). The proponent of the witness bears the burden of showing that the witness is qualified to testify as an expert. *Id*. at 151. We review the trial judge's decision to admit expert testimony

–17–

under Rule 702 for abuse of discretion. *See Innovative Block of S. Tex., Ltd. v. Valley Builders Supply, Inc.*, 603 S.W.3d 409, 423 (Tex. 2020).

The matters in question in this case are Culpepper's testamentary capacity and whether he executed the codicil because of undue influence by King. A testator has testamentary capacity when he has sufficient mental ability to understand he is making a will, the effect of making a will, and the general nature and extent of his property. *In re Estate of Blakes*, 104 S.W.3d 333, 336 (Tex. App.—Dallas 2003, no pet.).[1] He must also know the natural objects of his bounty and the claims upon them, and he must have sufficient memory to collect in his mind the elements of the business transacted and hold them long enough to form a reasonable judgment about them. *Id*. In a will contest, the pivotal issue is whether the testator had testamentary capacity on the day the will was executed, but evidence of the testator's state of mind at other times can be used to prove his state of mind on the day the will was executed, provided that the evidence demonstrates that a condition affecting his testamentary capacity was persistent and likely present at the time the will was executed. *Id*.

To set a will aside because of undue influence, a contestant must prove (1) the existence and exertion of an influence (2) that subverted or overpowered the testator's mind at the time he executed the instrument (3) so that the testator executed

---

[1] Although Culpepper executed the will and codicil in Alaska, neither side has argued that Alaska law governs the issues of testamentary capacity and undue influence. Accordingly, we apply Texas law. *See Highland Credit Opportunities CDO, L.P. v. UBS AG*, 451 S.W.3d 508, 515 n.12 (Tex. App.—Dallas 2014, no pet.) (applying Texas law when neither side raised a choice-of-law argument).

an instrument he would not otherwise have executed but for such influence. *In re Estate of Henry*, 250 S.W.3d 518, 523 (Tex. App.—Dallas 2008, no pet.).

## 2. Analysis

At the hearing of Dillon's motion to exclude Cassius's testimony, Cassius testified about his qualifications as follows. In 2002, he became a licensed professional counselor (LPC) in the state of Ohio, and at the time of trial in January 2020 he was also an LPC in Texas. As an LPC, he was qualified to diagnose and counsel people with mental health conditions including dementia. At the time of trial he had spent five years working towards a Ph.D. in forensic psychology from Walden University. He described forensic psychology as "a cross section of mental health and the court system, the law." *Cf. forensic psychiatry*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("The application of psychiatry in courts, esp. for the determination of competency to stand trial, criminal responsibility, parental fitness, liability to civil commitment, etc."). According to Cassius, he had already defended his thesis, which was entitled "Attorneys [sic] Understanding of the Lucid Interval and Testamentary Capacity Proceedings," and was merely waiting on the chief academic officer to sign off on his Ph.D. His experience included three forensic autopsies related to dementia.

Dillon argues that Cassius was not qualified to testify about Culpepper's capacity for several reasons. Cassius did not attend medical school or take any courses in medical science. At the time of trial, he did not have his Ph.D., was not a

forensic psychologist, and did not practice forensic psychiatry. He did not regularly treat people with dementia. He did not know the meaning of all of the terms in Culpepper's medical records, and he was unfamiliar with at least some of Culpepper's medications.

The question before us is whether the trial judge acted unreasonably in concluding that Cassius possessed special knowledge on the subject on which he proposed to give an opinion—Culpepper's mental abilities when he executed his will and codicil. *See Broders*, 924 S.W.2d at 152–53. We conclude that she did not. Cassius testified that he had five years of post-graduate education in forensic psychology and that he would receive his Ph.D. in the field "any minute now." His Ph.D. thesis concerned testamentary-capacity proceedings. And he had previously done three forensic autopsies related to dementia. Given Cassius's training and experience, we conclude that the trial judge did not abuse her discretion by concluding that Cassius met the minimum qualifications to be permitted to testify about Culpepper's mental abilities when he executed the will and codicil.

C. **Did the trial judge abuse her discretion by concluding that Cassius's expert opinions were reliable enough to be admissible?**

Last, we address Dillon's argument that Cassius's expert opinions were not reliable enough to be admissible and that the trial judge erred by denying Dillon's motion to exclude Cassius on that basis.

### 1.    Applicable Law

A qualified expert's opinion testimony is admissible "if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." TEX. R. EVID. 702. To be admissible under Rule 702, the proposed testimony must be relevant and reliable. *E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995). Expert testimony is unreliable if it is based on an unreliable foundation or a flawed methodology. *TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 234 (Tex. 2010). We have held that psychological and psychiatric opinion testimony about testamentary capacity involves "soft science," for which the appropriate reliability factors are (1) whether the field is a legitimate field of expertise, (2) whether the subject matter is within that field's scope, and (3) whether the expert's testimony properly relies on the principles involved in that field of study.[2] *Tex. Capital Bank v. Asche*, No. 05-15-00102-CV, 2017 WL 655923, at *7–8 (Tex. App.—Dallas Feb. 17, 2017, pet. dism'd) (mem. op.).

The proponent of expert testimony bears the burden of showing that the testimony is based on a reliable foundation. *See Robinson*, 923 S.W.2d at 556.

---

[2] Other kinds of expert opinion may call for the consideration of other reliability factors, such as (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subject to peer review or publication; (4) the technique's potential rate of error; (5) whether the theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses that have been made of the theory or technique. *See TXI Transp. Co.*, 306 S.W.3d at 235 & n.2.

–21–

We review the trial judge's decision to admit expert testimony for abuse of discretion. *Innovative Block of S. Tex., Ltd.*, 603 S.W.3d at 423.

**2.    Analysis**

Dillon attacks Cassius's opinions for several different reasons, which we address in turn.

**a.    Cassius's View of Mini Mental Status Examination Results**

First, Dillon argues that Cassius's opinion that Culpepper possessed sufficient capacity to sign the codicil is unreliable because it was based in part on Cassius's view of a Folstein Mini Mental Status Examination (MMSE) performed on Culpepper by his physician, Dr. Ahn. Cassius opined that an MMSE is lacking in some areas, such as "executive functioning," and he elaborated that "[t]here is poor content validity to make an interpretation based on somebody's executive functioning with the MMSE exam." Dillon argues that Cassius's view is unreliable because Dillon's expert witness, Dr. Lisa Clayton, opined that Culpepper's MMSE score, together with his MRI and EEG results, placed him in the moderate stage of dementia, during which he would have had "basically no executive functioning."

We disagree with Dillon's argument. We see nothing in the record squarely contradicting Cassius's view of MMSE results, much less establishing that his view is unreliable. Clayton herself testified that an MMSE result, in and of itself, is not enough to support a conclusion that someone has dementia, and she called the MMSE "kind of a rudimentary test." As for Clayton's conclusion that a person with

moderate dementia would have basically no executive functioning, her testimony may conflict with Cassius's, but conflicting expert testimony does not necessarily show that one expert's opinion is unreliable. *See CBS Outdoor, Inc. v. Potter*, No. 01-11-00650-CV, 2013 WL 269091, at *14 (Tex. App.—Houston [1st Dist.] Jan. 24, 2013, pet. denied) (mem. op.) ("Proof that one expert testified to the contrary of the opponent's expert is not proof that the opponent's methodology is flawed.").

### b. The Adequacy of Cassius's Foundational Data

Next, Dillon points out that Cassius testified that he formed his opinions based on Culpepper's medical records and by speaking with people who knew Culpepper. Dillon further points out that Cassius said he spoke with only four people and that his opinion was "formed largely on the testimony of laypeople." Although Dillon does not expressly assert that Cassius's opinion is unreliable because it is based on insufficient foundational data, she implies as much. To the extent Dillon makes such an argument, we disagree with it. Dillon points to nothing in the record showing that opinions about a deceased person's mental capacity cannot reliably be based on a combination of medical records and witness interviews, or that some minimum number of witness interviews is essential for reliability. *See Tex. Capital Bank*, 2017 WL 655923, at *11 (rejecting reliability challenge where expert based her testamentary-capacity opinion on medical records, CT scan, and observations of people who knew the decedent)

### c. Cassius's Reliance on the IDEAL Model for Undue Influence

Dillon next challenges Cassius's opinion that it was unlikely that King had undue influence on Culpepper. Dillon argues that the opinion was based on an unreliable methodology that Cassius referred to as the IDEAL model. In Cassius's expert report, which was admitted into evidence, Cassius said that the IDEAL model, developed by Dr. Bennett Blum, M.D., is one of the best-known models for assessing potential undue influence. The model recommends consideration of five factors in financial cases: (1) isolation from pertinent information, friends, relatives, or usual advisors; (2) dependence, whether physical, emotional, or informational; (3) emotional manipulation and/or exploitation of vulnerability; (4) acquiescence because of the first three factors; and (5) financial loss. Cassius considered the information he had about Culpepper in light of these factors in reaching his conclusion that it was unlikely that King had undue influence on Culpepper.

On appeal, Dillon argues that King did not support the validity of the IDEAL model with evidence of peer review or publication, that the model appears to rely heavily on subjective interpretation, that there was no evidence about the technique's potential rate of error, and that there was less than a scintilla of evidence to show that the IDEAL model has been generally accepted as valid by relevant professionals. Moreover, Clayton testified that she was not familiar with the IDEAL model.

Dillon's critique of the record support for the IDEAL model's reliability has some force. However, assuming without deciding that the trial judge abused her discretion by admitting Cassius's undue-influence opinion, we conclude that admission of this evidence did not probably cause the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1(a). A successful challenge to an evidentiary ruling usually requires the complaining party to show that the judgment turns on the particular evidence admitted or excluded. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753–54 (Tex. 1995). This determination requires review of the entire record. *Id*. at 754. Here, the IDEAL model, as described by Cassius, amounted to little more than common sense—people who are isolated, dependent, and subjected to manipulation or exploitation are more susceptible to improper influence. And Cassius's specific undue-influence conclusion in this case, which was based on witness descriptions of Culpepper, is unlikely to have swayed the trial judge more than the witness descriptions themselves did.

### d. Cassius's Testimony About the "Lucid Interval"

Finally, Dillon challenges the reliability of the following testimony by Cassius: "I learned [in my studies] that there is a concept of a lucid interval that can take place when someone has dementia according to the perspective of the research literature." Dillon argues that this testimony was unreliable because it was unsupported by evidence of the reliability factors.

We conclude that any error in the admission of Cassius's statement quoted above was harmless. The statement was a general statement that "research literature" refers to a concept that dementia sufferers can have lucid intervals. It was not an opinion about Culpepper's capacity or lucidity, much less an opinion about his capacity or lucidity specifically when he executed his will and codicil. We conclude that the judgment did not turn on this testimony, so it did not probably cause an improper judgment. *See City of Brownsville*, 897 S.W.2d at 753–54.

## D. Conclusion

We overrule Dillon's third issue.

## V. Standing and Capacity

Dillon's seventh issue challenges the trial court's conclusions of law that Dillon lacked standing to bring certain claims on behalf of Culpepper's estate and lacked capacity to bring certain other claims on behalf of Culpepper's estate.

## A. Res Judicata

First, Dillon asserts that the trial judge's rulings regarding her standing and capacity were foreclosed by res judicata. She points out that, several months before trial, the trial judge issued an interlocutory order in the 2019 Case deciding certain motions, and the judge stated therein, "THE COURT FINDS that Plaintiff [Dillon] has standing to bring this suit against Defendant [King] and that the Court has subject-matter jurisdiction over the suit." But Dillon cites no legal authority in support of her res-judicata argument, does not explain the law of res judicata, and

does not attempt to apply the law to this case's facts. We conclude that the argument is inadequately briefed and therefore do not consider it. *See* TEX. P. APP. P. 38.1(i); *Bolling v. Farmers Branch Indep. Sch. Dist.*, 315 S.W.3d 893, 896 (Tex. App.—Dallas 2010, no pet.).

## B.    Standing

Dillon also argues that there is no standing problem with respect to any of the tort claims she asserted against King on behalf of Culpepper's estate because those claims are survival claims that Culpepper would have been entitled to assert but for his death. *See Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 850 (Tex. 2005) ("[I]n a survival action, the decedent's estate has a justiciable interest in the controversy sufficient to confer standing.").

We agree with Dillon. Under *Lovato*, the estate possessed standing, and the proper question is one of capacity—whether Dillon possessed capacity to bring survival claims on the estate's behalf, as she attempted to do in her live pleading in the 2019 Case. *See id*. at 848–50 (capacity concerns the legal authority to act, and only certain individuals are afforded the capacity to sue on an estate's behalf). Thus, the trial judge's conclusions that Dillon lacked standing to assert claims for breach of fiduciary duty, conversion, and fraud by nondisclosure on behalf of Culpepper's estate are erroneous, and we disregard them.

However, the trial judge also found that Dillon failed to prove certain essential elements of each of those three claims, and Dillon does not challenge those findings

–27–

on appeal. "Any unchallenged findings of fact that support the judgment will preclude reversal of the case." *In re Estate of Miller*, 243 S.W.3d 831, 839 (Tex. App.—Dallas 2008, no pet.). Because the trial judge's findings against Dillon on essential elements of these claims independently support the take-nothing judgment on those claims, we hold that the trial judge's erroneous conclusion that Dillon lacked standing to assert them is not reversible error.[3]

## C. Capacity

The trial judge concluded that Dillon lacked capacity to assert a Texas Theft Liability Act claim or an unjust-enrichment claim on the estate's behalf. Dillon asserts that she has capacity to assert those claims for the estate because (1) the estate's personal representative (King) cannot or will not assert the claims or (2) King's interests are antagonistic to the estate's interests.

However, the trial judge also found that Dillon failed to prove certain essential elements of both of those claims, and those findings independently support the take-nothing judgment on those claims. Dillon does not challenge those findings on appeal. Thus, even if we assume that the judge's rulings that Dillon lacked capacity to bring those claims were erroneous, that error is not reversible. *See In re Estate of Miller*, 243 S.W.3d at 839.

---

[3] If a claimant lacks standing to assert a claim, the trial court should dismiss the claim for lack of jurisdiction rather than render a take-nothing judgment. *See Patrusky v. Bloomberg*, No. 05-14-00175-CV, 2015 WL 3896097, at *4 (Tex. App.—Dallas June 24, 2015, no pet.) (mem. op.).

**D. Conclusion**

We overrule Dillon's seventh issue on appeal.

## VI. Motion to Compel Discovery

Dillon's sixth issue challenges the trial judge's denial of her motion to compel discovery. We review that ruling for abuse of discretion. *See Tunad Enters. Inc. v. Palma*, No. 05-19-00497-CV, 2020 WL 3410633, at *2 (Tex. App.—Dallas June 22, 2020, no pet.) (mem. op.).

We conclude that Dillon has not shown an abuse of discretion. Her argument does not identify the motion to compel or the discovery requests that she relies on, nor does it discuss the substance of the motion or those discovery requests. It contains no record references to the trial-court proceedings on her motion to compel or to the trial judge's ruling. Instead, her argument consists of about three pages of block quotations from the trial, during which (1) King acknowledged that she did not have records to substantiate at least some of her testimony about Culpepper's finances and (2) Dillon's lawyer mentioned not being allowed to conduct discovery into Culpepper's finances "past the date of death." These quotations are bookended with bare assertions that the trial judge erred and Dillon was prejudiced.

Without an analysis of the motion to compel and the discovery requests on which it was based, we cannot conclude that the trial judge abused her discretion. *See Bolling*, 315 S.W.3d at 896 (issue cannot be sustained if appellate court "must speculate or guess about what contentions are being made").

We overrule Dillon's sixth issue.

## VII.    Sufficiency of the Evidence

In her first issue, Dillon argues that the evidence is legally or factually insufficient to support the trial judge's finding that Culpepper possessed testamentary capacity. In her second issue, Dillon argues that the evidence is legally or factually insufficient to support a finding that Culpepper possessed capacity to contract on two occasions—when he executed a power of attorney in favor of King in February 2012 and when he executed a beneficiary designation on a financial account in October 2012. We overrule these issues for the following reasons.

### A.    Testamentary Capacity

#### 1.    Burden of Proof and Standard of Review

The proponent of a will bears the burden of proving testamentary capacity. *Long v. Long*, 196 S.W.3d 460, 464 (Tex. App.—Dallas 2006, no pet.), *overruled on other grounds by Chakrabarty v Ganguly*, 573 S.W.3d 413 (Tex. App.—Dallas 2019, no pet.) (en banc).

We review the legal and factual sufficiency of the evidence to support a trial judge's findings of fact after a bench trial under the same standards applicable to a jury's verdict.  *Guillory v. Dietrich*, 598 S.W.3d 284, 293 (Tex. App.—Dallas 2020, pet. denied).

Because Dillon did not bear the burden of proof on the issue of testamentary capacity, her challenge to the legal sufficiency of the evidence is a no-evidence

challenge. *See id*. We view the evidence in the light most favorable to the finding, crediting favorable evidence if a reasonable factfinder could and disregarding contrary evidence unless a reasonable factfinder could not. *Id*. We sustain a no-evidence challenge if the evidence is so weak that it does no more than create a mere surmise or suspicion that the fact is true. *Id*. On the other hand, we overrule a no-evidence challenge if the evidence is sufficient to allow reasonable and fair-minded people to reach the finding under review. *Id*.

When an appellant challenges the factual sufficiency of the evidence to support an adverse finding on an issue on which she did not have the burden of proof, she must demonstrate that there is insufficient evidence to support the adverse finding. *See Hoss v. Alardin*, 338 S.W.3d 635, 651 (Tex. App.—Dallas 2011, no pet.) (jury findings). We consider all the evidence in the record and set the finding aside only if the evidence supporting the finding is so weak or the finding is so against the overwhelming weight of the evidence that the finding is clearly wrong and unjust. *See id*. The trial judge, as factfinder, is the sole judge of witness credibility. *Wyde v. Francesconi*, 566 S.W.3d 890, 894 (Tex. App.—Dallas 2018, no pet.). If the evidence falls within the zone of reasonable disagreement, we will not substitute our judgment for that of the factfinder. *Id*.

### 2. Law of Testamentary Capacity

A testator has testamentary capacity if he has sufficient mental ability to understand he is making a will, the effect of making a will, and the general nature

and extent of his property. *Long*, 196 S.W.3d at 464. He must also know his next of kin and the natural objects of his bounty, and he must have sufficient memory to collect in his mind the elements of the business transacted and hold them long enough to form a reasonable judgment about them. *Id*.

The pivotal issue is whether the testator had testamentary capacity on the day the will was executed. *Id*. at 464–65. However, evidence of the testator's state of mind at other times can be used to prove his state of mind on the day he executed the will if the evidence demonstrates that a condition affecting his testamentary capacity was persistent and likely was present at the time the will was executed. *Id*. at 465. Circumstantial evidence may be relevant to testamentary capacity, such as evidence of the testator's conduct, circumstances tending to produce a particular mental condition, and the prior or subsequent existence of a mental condition from which the testator's capacity or incapacity at the relevant time may be inferred. *Tex. Capital Bank v. Asche*, No. 05-15-00102-CV, 2017 WL 655923, at *6 (Tex. App.—Dallas Feb. 17, 2017, pet. dism'd) (mem. op.).

### 3. Evidence

We focus on the evidence relevant to Culpepper's capacity on September 9, 2011, when he executed his will, and October 30, 2012, when he executed the codicil.

### a. Culpepper's Medical Records

Culpepper's medical records kept by his doctor, Dr. Ahn, were admitted into evidence. They contain the following facts, findings, and opinions, among many others.

Culpepper first visited Ahn in October 2011. Ahn's notes from that visit recite that Culpepper had (1) gradually worsening recall since April 2009, (2) chronic irritability and paranoid delusions of people stealing his money, (3) visual hallucinations at night for the previous year, and (4) problems with misplacing and losing things in his house. For Ahn's "Assessment/Plan," he wrote, "ENCEPHALOPATHY, UNSPECIFIED (348.30) – likely parkinsons dementia. Other possibilities including Alzheimers, and [L]ewy body dementia are less likely." That same month, Culpepper had an EEG study performed, and the resulting report recited, "Abnormal Digital EEG, because of a mild generalized cerebral dysfunction. This may be seen in metabolic encephalopathy or chronic dementia process."

Culpepper saw Ahn again in February 2012. Ahn's notes for that visit recite, "Overall, his mentation has remained stable." They also recite, under "Assessment/Plan," "SENILE DEGENERATION OF BRAIN (331.2) – parkinsons dementia."

Culpepper saw Ahn again in August 2012, less than three months before Culpepper executed the codicil. Ahn recorded that Culpepper had had a myocardial infarction in March 2012. He also recorded that "his mentation has remained stable."

His assessment/plan recited, "SENILE DEGENERATION OF BRAIN (331.2) – parkinsons dementia. Stable."

Culpepper next saw Ahn in April 2013, about five months after Culpepper executed the codicil. Ahn's assessment/plan recited, "SENILE DEGENERATION OF BRAIN (331.2) – parkinsons dementia. Steady decline. Now with anxiety and agitation intermittently." Culpepper continued to see Ahn after that, and Ahn's notes reflected a continuing decline in Culpepper's mental abilities up to June 2016.

### b. Expert Testimony

Dillon and King introduced conflicting expert testimony about Culpepper's testamentary capacity at the relevant times.

King's expert, Jeremy Cassius, testified from Ahn's records that Culpepper had dementia that got progressively worse from 2011 to 2014. He testified that "the more mild diagnosis of Parkinson's disease dementia was given to [Culpepper] in 2011 and the more severe diagnosis of dementia of Lewy bodies was given to him in 2014." He also explained that Parkinson's disease dementia "mainly affect[s] the motor cortex," while Lewy body dementia "affects personality, cognition, learning, attention, executive functioning, [and] ability to make decisions." Cassius also interviewed four people who knew Culpepper and dealt with him around the times he executed his will and codicil, including Culpepper's financial advisor and the attorney who assisted him with his codicil. Cassius's report was admitted into

evidence, and therein he opined that Culpepper had testamentary capacity to sign the will in 2011 and the codicil in 2012.

Dillon's expert witness, Dr. Lisa Clayton, reviewed Culpepper's medical records, including his EEG, and testified that Culpepper probably was in the "moderate stage" of dementia when he began seeing Ahn in October 2011 and had an EEG that same month. She testified that a person with moderate dementia "would have basically no executive functioning, meaning that they—they might could do superficial things, but as far as problem solving and thinking and holding something in their mind for a period of time . . . they would have difficulty managing most of their affairs." She further testified that in September 2011, when Culpepper executed his will, it would have been difficult for him to achieve some of the elements of testamentary capacity, and by October 2012, when he executed his codicil, his executive function would have diminished substantially from the previous year. Clayton's report was admitted into evidence, and therein she opined that Culpepper did not have testamentary capacity when he executed his will or his codicil.

### c.    Other Evidence

Lay-witness testimony relevant to Culpepper's mental capacity was also admitted.

Lekeisa Rockwell, a supervisor for the Adult Protective Services Division of the Department of Family and Protective Services, testified at trial. From August to November 2012, she investigated an allegation that Dillon was exploiting Culpepper

by taking his money. Her report, which was admitted into evidence, recited that she had a face-to-face interview with Culpepper in September 2012, and it said, "Worker observes Client is alert & oriented X3, aware of situation, and answers questions appropriately."

Later in September 2012, Rockwell interviewed Dillon and recorded that Dillon said that Culpepper "does have dementia but is not impaired." Rockwell's file also included a written statement by Dillon dated September 26, 2012, in which Dillon wrote, "My Father is fully aware of what is going on around him," and she further wrote that Culpepper had recently driven himself to Louisiana to visit family, stayed four days, and then returned to Texas without any problems at all. At trial, Rockwell did not specifically remember Culpepper from her investigation eight years earlier, but she testified that she would have noted any concerns about his capacity in her report if she had had any.

King testified that Culpepper traveled to Alaska in October 2012 to meet with his financial advisor, to meet with an attorney to change his will, and to go through his old house to see what he wanted to have shipped to Texas. During his time in Alaska, Culpepper stayed in his own house, and King had no concerns about him doing so. King testified that Culpepper did not exhibit any erratic behavior and that she did not observe any forgetfulness. King also testified that she did not remember when she started seeing symptoms of mental decline, but she thought Culpepper started showing signs of dementia before October 2012. She said that she had no

reason to doubt Culpepper's ability to give gifts at the time of the TAPS investigation in the second half of 2012.

Finally, Dillon's ex-husband Roderick Dillon testified. Roderick[4] was a retired policeman. He got to know Culpepper during his friendship with and marriage to Dillon. According to Roderick, Culpepper's behavior "was fine in 2011," compared to when Roderick had first met him. Culpepper recognized Roderick and recognized the relationship they had at that time. In September 2011, Roderick and Culpepper drove together from Alaska to Texas, and there was nothing bizarre about Culpepper's behavior. Culpepper had no memory issues on the trip, and he understood where they were going and why. From September 2011 until perhaps early 2013, Culpepper lived down the street from Roderick. No one brought up any capacity issues when Culpepper bought the house in 2011.

In 2012, Roderick had no concern about Culpepper's living alone. Culpepper was still able to recognize Roderick and remembered their history. Culpepper and Roderick went fishing together in June 2012, and Culpepper understood what was going on at that time. He did not have erratic behavior or mood swings. During that trip, Culpepper had long telephone conversations with his girlfriend, and he understood who he was talking to. In September 2012, Culpepper drove to Louisiana to see his relatives and drove back three or four days later.

---

[4] We use his first name to distinguish him from appellant Marsha Dillon.

Roderick thought Culpepper changed in December 2012 after having several teeth extracted. Medical records admitted into evidence showed that Culpepper had surgery on December 17, 2012, for the removal of abscessed teeth. Culpepper received general anesthesia for that procedure. He developed urinary retention after the procedure, and a catheter was inserted. He was sent home the next day with the catheter in place, but he pulled it out and had to be readmitted to the hospital.

According to Roderick, Culpepper started having "night terrors" after his tooth extraction. In early 2013, Culpepper started having nightmares and hallucinations at night. He thought people were there who were not supposed to be there. Roderick did not notice any odd behavior by Culpepper until he started having the nightmares.

### 4. Analysis

The record contains conflicting expert testimony as to whether Culpepper possessed testamentary capacity when he executed his 2011 will and his 2012 codicil. When the evidence presents a "battle of the experts," the appellate court defers to the factfinder's resolution of conflicts in the evidence. *See Creech v. Columbia Med. Ctr. of Las Colinas Subsidiary, L.P.*, 411 S.W.3d 1, 15 (Tex. App.— Dallas 2013, no pet.) ("The jury decides which expert witnesses to credit.").

Additionally, the parties presented circumstantial evidence, including witness observations of Culpepper near the relevant times, for the trial court to consider. The testimony of Roderick Dillon, in particular, supports conclusions that Culpepper

possessed his normal faculties around the relevant times and that Culpepper's capacity did not start to decline noticeably until December 2012—after Culpepper executed his codicil.

Dillon argues that the lay testimony of King's witnesses cannot controvert the opinions of expert witness Clayton, citing *Anderson v. Snider*, 808 S.W.2d 54 (Tex. 1991) (per curiam), and *Ersek v. Davis & Davis, P.C.*, 69 S.W.3d 268 (Tex. App.—Austin 2002, pet. denied). We conclude that those cases are distinguishable. First, they both involved legal-malpractice claims, and in Texas a legal-malpractice plaintiff must support his or her claim with expert testimony proving the standard of care. *See Ersek*, 69 S.W.3d at 271; *see also Anderson*, 808 S.W.2d at 54–55. In testamentary-capacity cases, however, evidence about the testator's competency may include lay testimony in the form of witness observations of the testator's conduct, both before and after the execution of the will. *See Kenney v. Estate of Kenney*, 829 S.W.2d 888, 890 (Tex. App.—Dallas 1992, no writ); *see also Tex. Capital Bank*, 2017 WL 655923, at *6 ("Circumstantial evidence may be relevant to the capacity issue including . . . the [testator's] conduct . . . ."). *Ersek* is also distinguishable because in that case only one side produced expert testimony on the disputed issue. 69 S.W.3d at 270, 274–75. Similarly, *Anderson* was a summary-judgment appeal in which the defendant attorney's affidavit was the only expert affidavit filed. 808 S.W.2d at 54–55 (holding that attorney's affidavit was

conclusory and incompetent). In this case, however, the parties introduced conflicting expert testimony on the testamentary-capacity issue.

We conclude that the evidence would allow reasonable and fair-minded people to conclude that Culpepper possessed testamentary capacity when he executed his will and his codicil. Accordingly, we hold that the evidence is legally sufficient to support the finding of testamentary capacity. Likewise, after reviewing all the evidence and deferring to the trial judge's credibility determinations, we conclude that the evidence supporting the testamentary-capacity finding is not so weak, and the evidence contrary to the finding is not so overwhelming, as to make the finding clearly wrong and unjust. Accordingly, we hold that the evidence is factually sufficient to support the finding of testamentary capacity.

We overrule Dillon's first issue on appeal.

## B.    Capacity to Contract

### 1.    Burden of Proof and Standard of Review

Dillon bore the burden of proving that Culpepper lacked capacity to contract at the relevant times (February and October 2012). *See Swink v. City of Dallas*, 36 S.W.2d 222, 224 (Tex. Comm'n App. 1931, holding approved); *Estate of Riefler*, 540 S.W.3d 626, 635 (Tex. App.—Amarillo 2017, no pet.).

Again, we review the sufficiency of the evidence to support a trial judge's findings of fact after a bench trial under the same standards applicable to a jury's verdict. *Guillory*, 598 S.W.3d at 293.

When an appellant challenges the legal sufficiency of the evidence supporting an adverse finding on an issue on which the appellant had the burden of proof, she must show that the evidence establishes as a matter of law all vital facts in support of the issue. *See PopCap Games, Inc. v. MumboJumbo, LLC*, 350 S.W.3d 699, 710 (Tex. App.—Dallas 2011, pet. denied) (jury findings). We must credit evidence favorable to the finding if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *See id*. If there is no evidence to support the finding, we then review the entire record to determine if the contrary proposition is established as a matter of law. *Id*. We sustain the point only if the contrary proposition is conclusively established. *Id*.

When an appellant appeals the factual sufficiency of the evidence supporting an adverse finding on an issue on which the appellant had the burden of proof, she must show that the adverse finding is against the great weight and preponderance of the evidence. *Id*. at 722. We must consider and weigh all of the evidence, and we set the finding aside only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that the finding is clearly wrong and unjust. *Id*.

### 2.    Law of Capacity to Contract

Documents executed by a person who lacks sufficient mental capacity may be avoided. *Anderton v. Green*, 555 S.W.3d 361, 371 (Tex. App.—Dallas 2018, no pet.). To have mental capacity, a person must have sufficient mind and memory to

understand the nature and effect of his act at the time of the document's execution. *Id.* Capacity may be assessed by considering factors such as (1) the person's outward conduct, (2) preexisting external circumstances that tend to produce a special mental condition, and (3) the person's mental condition before and after the relevant point in time, from which his mental capacity or incapacity may be inferred. *Id.*

Expert testimony of capacity to contract is not required because the requisite proof may reside within the common knowledge and experience of laypersons. *Id.*

### 3. Analysis

Dillon argues that there is no evidence or insufficient evidence that Culpepper had capacity to contract when he executed a power of attorney in February 2012 and a beneficiary-designation form in October 2012. Because Dillon bore the burden of proof on this capacity issue, she must show that she conclusively proved that Culpepper lacked capacity on those occasions or that the trial judge's contrary finding was contrary to the great weight and preponderance of the evidence.[5] *See PopCap Games, Inc.*, 350 S.W.3d at 710, 722.

Dillon argues that the evidence conclusively or overwhelmingly supported her incapacity-to-contract defense because (1) her expert, Clayton, specifically testified

---

[5] Although the trial judge made an express finding that Culpepper had testamentary capacity, the judge did not make a finding about whether Culpepper had capacity to contract. Dillon does not mention this omission and briefs the issue as if the judge found that Culpepper possessed capacity to contract. We will assume without deciding that we should presume a finding on this issue consistent with the judgment. *See* TEX. R. CIV. P. 299 (regarding omitted and presumed findings).

that Culpepper lacked capacity to contract and (2) lay-witness testimony could not controvert Clayton's opinion testimony.

We disagree with Dillon's argument. Even uncontroverted expert opinion testimony is not conclusive unless the subject is one for experts or skilled witnesses alone. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986). Capacity to contract is not a subject for which expert testimony is required. *See Anderton*, 555 S.W.3d at 371. Thus, Clayton's testimony that Culpepper lacked capacity to contract was not conclusive evidence of that fact, and the trial judge was free to consider the entirety of the evidence and to reject Clayton's opinions. *See McGalliard*, 722 S.W.2d at 697 (factfinder is entitled to disbelieve witnesses and to accept lay testimony over that of experts).

Moreover, the lay testimony from Rockwell, King, and Roderick Dillon about Culpepper's behavior during the relevant time frame is also relevant evidence the trial judge could consider and credit.[6] For example, although Clayton opined that Culpepper most probably lacked capacity to buy his house in 2011, Roderick Dillon testified that Culpepper's decision to buy the house was "a logical, fine decision" and that no one brought up any capacity issues at that time. Additionally, there was

---

[6] We do not consider Cassius's testimony on this capacity-to-contract issue because when the parties argued Dillon's motion to strike Cassius for late designation, King represented that she would call Cassius only "on the Codicil."

evidence that in September 2012 Dillon told TAPS investigator Rockwell that Culpepper was not impaired even though he had dementia.

In sum, we reject Dillon's legal-sufficiency challenge because the evidence does not establish as matter of law that Culpepper lacked capacity to contract at the relevant times. And we reject Dillon's factual-sufficiency challenge because the failure to find that Culpepper lacked capacity to contract is not so against the great weight and preponderance of the evidence as to be manifestly unjust.

We overrule Dillon's second issue.

## VIII. Disposition

Having overruled all of Dillon's issues, we affirm the trial court's judgment.


/Dennise Garcia/
DENNISE GARCIA
JUSTICE

200215F.P05

–44–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

MARSHA DENISE DILLON,
BENEFICIARY, ON BEHALF OF
THE ESTATE OF BASKIN J.
CULPEPPER AND MARSHA
DILLON, INDIVIDUALLY,
Appellant

No. 05-20-00215-CV     V.

KIMBERLY KING, Appellee

On Appeal from the Probate Court
No. 2, Dallas County, Texas
Trial Court Cause No. PR-17-01307-
2.
Opinion delivered by Justice Garcia.
Justices Schenck and Smith
participating.

In accordance with this Court's opinion of this date, the trial court's judgment and its order probating will and codicil and authorizing letters testamentary are **AFFIRMED**.

It is **ORDERED** that appellee Kimberly King recover her costs of this appeal from appellant Marsha Denise Dillon, Beneficiary, on Behalf of the Estate of Baskin J. Culpepper and Marsha Dillon, Individually.

Judgment entered May 4, 2022.